803 So.2d 406 (2001)
Tonya Lynne AGEE, Plaintiff-Appellee,
v.
James M. SPEERS and Ina S. Rollins, Defendants-Appellants.
No. 35,600-CA.
Court of Appeal of Louisiana, Second Circuit.
December 19, 2001.
*407 Boggs & Thompson by A. Michael Boggs, Bossier City, Counsel for Appellants, James Speers and the Unopened Succession of Ina S. Rollins.
*408 Tommy K. Cryer, Shreveport, Counsel for Appellee.
Before BROWN, WILLIAMS and GASKINS, JJ.
BROWN, J.
Defendants, James M. Speers and the Unopened Succession of Ina S. Rollins, appeal a judgment of the trial court reducing the purchase price of immovable property by $7,500, together with attorney fees and costs in this redhibitory action. For the following reasons, we affirm the judgment of the trial court.

Facts
On September 22, 1997, plaintiff, Tonya Lynne Agee Mann ("Agee"), purchased a lot with improvements, including a mobile home and garage apartment, located at 5632 Benton Road near Benton, Louisiana, from defendants, James M. Speers and Ina S. Rollins. The purchase price was $58,500. Ms. Agee testified that she was particularly interested in the property due to the separate garage apartment. Ms. Agee wanted to provide a separate residence for her mother and this feature of the property was a significant factor in her decision to purchase the property.
Prior to closing the sale, a property inspection revealed that there were several problems that needed to be addressed in both the mobile home and garage apartment. According to Ms. Agee, the problems appeared to have been taken care of and she closed the sale. Shortly afterwards, when making some cosmetic changes in the garage apartment, Ms. Agee discovered that the paneled wall behind the toilet in the bathroom concealed water-soaked sheetrock, and rotten, insect-damaged wall studs apparently due to periodic flooding. Further inspection revealed that the roof of the building, which had been mentioned in the inspection prior to purchase as needing additional bracing, was constructed with substandard materials. The repairs required extensive remodeling, including installation of a new roof and the replacement of some of the framing, drywall, electrical lines, plumbing and flooring. Ms. Agee filed the instant redhibition suit seeking a diminution in the sales price equal to her outlay for these repairs and award of general damages, attorney fees and costs.
The trial court concluded that the garage apartment contained redhibitory defects and that the sellers had attempted to conceal the fact that the garage apartment flooded. Specifically, the trial court found that there was rotten wood damage in the bathroom walls that had been concealed by paneling, and the roof was constructed with substandard materials. The court reduced the purchase price by $7,500, half the amount requested by plaintiff, and awarded $2,500 in attorney fees.
Defendants appeal the finding of redhibitory defects, the finding of bad faith and the reduction of the purchase price by $7,500.

Discussion
In Gaston v. Bobby Johnson Equipment Co. Inc., 34,028 (La.App. 2d Cir.11/03/00), 771 So.2d 848, this court explained the law of redhibition. A seller warrants the buyer against redhibitory defects or vices in the thing sold. A defect is redhibitory when it renders the thing useless, or its use so inconvenient that it must be presumed the buyer would not have bought the thing if he had known of the defect. The existence of such a defect gives a buyer the right to obtain rescission of the sale. La.C.C. art. 2520. Gaston, supra. However, a buyer may choose to seek only reduction of the price even when the redhibitory defect is such as to give him the right to obtain rescission of the sale. La.C.C. art. 2541.
*409 The implied warranty against redhibitory defects covers only hidden defects, not defects that were known to the buyer at the time of the sale, or defects that should have been discovered by a reasonably prudent buyer. La.C.C. art. 2521. A seller who knows that the thing he sells has a defect but fails to declare it or misrepresents the quality of a thing is liable not only for the return of the purchase price with interest from the time it was paid and reasonable expenses occasioned by the sale and those incurred for the preservation of the thing, but also for damages and reasonable attorney fees. La.C.C. Art. 2545. A seller is deemed to know that the thing he sells has a redhibitory defect if he manufactured the thing. La.C.C. 2545.
The existence of redhibitory defects is a question of fact, and the trial court's conclusions about them should not be set aside absent manifest error. Gaston, supra.
The pivotal issue in this case is whether Ms. Agee was made aware of the problems upon which she based the redhibitory action by the inspection report of Rhea or in Speers' disclosure statement. Appellants contend that these two documents disclosed the alleged defects to Ms. Agee, or at least put her on notice warranting further inquiry, and therefore, the defects were not redhibitory (hidden), nor were they, as sellers, in bad faith.
The garage apartment structure consists of a 20' × 40' building in front of and adjacent to the mobile home. Originally, the structure was simply an open carport with a concrete slab poured around the posts supporting the roof. Speers testified that he personally enclosed the walls with siding and converted the back of the building to an apartment by installing walls and ceilings that divided the quarters into a living room, kitchen, bedroom and bathroom, while the front part of the building remained a garage. A sidewalk runs from the door of the apartment to an enclosed porch in front of the mobile home. Speers, who admitted that he was not a skilled carpenter, did not obtain building permits or the inspections typically required for residences, although there was some question at trial whether they were required outside the city limits. Expert testimony at trial indicated that ordinary residential construction methods and standards were not followed.
Speers executed a "property condition disclosure form" on June 17, 1997. The form consists of a list of questions regarding the condition of the property and improvements, including specific questions about the condition of the roof, foundation, wall and roof structure, wiring, plumbing, whether the property ever flooded, whether it had drainage problems, whether it ever had termites, and whether the seller knew of any additions, repairs or substandard workmanship in the property. Speers checked the "no" column on all of those matters listed above, except for the questions on drainage, termites and building additions. The question on termites was left blank. Although he checked that the property did not flood, Speers wrote concerning drainage that the property "has low spot which holds water if have very heavy or prolonged rain." Regarding his knowledge of additions and repairs, Speers listed "deck, pool, front porch and garage apartment and garage" as "additions" and he marked through the phrase "substandard workmanship," thereby eliminating this part of the question.
At trial, Speers testified that the "low spot" referred to on the form is essentially the entire yard. Although Speers did not disclose that the property flooded and that water would enter the garage apartment, his testimony indicates that he was aware *410 that the property "became a lake" whenever it rained. According to Ms. Agee and George Rhea, the inspector, Speers never discussed the flooding problems, nor did he mention anything regarding the quality of workmanship or structural defects.
Rhea, a real estate inspector, inspected the property before closing. At trial, the parties stipulated that Rhea was an expert in the field of home inspections. Rhea testified that he performed an inspection of the property on August 15, 1997. The inspection report disclaimed that it was intended to reveal all existing or potential defects. Further, it states that "building code or zoning ordinance violations" and "structural integrity" were not within the scope of the inspection.
Several features of the property earned an "u" grade indicating that those features were "considered to be in need of attention." The ambiguity and lack of specificity of this phrase in the report is matched by Rhea's ambivalent testimony. When further asked to explain the assessment, Rhea testified that "u" did not necessarily mean "unacceptable" because it is not a "grade." At the end of the report, Rhea summarized his findings and noted that "[g]rade is above the foundation wall on the north side of the mobile home. Water appears to pond on the south side of the apartment. Grade slope and drainage improvement needed to allow water to be diverted away from the structures."
The report also notes that the "[s]eller indicates that he did not get a permit for the apartment/garage ...," and the "addons are not good quality workmanship." The report noted that the garage apartment roof sagged in several places and "[i]t appears that some additional bracing is needed." The report went on to note several electrical and plumbing problems and the lack of attic ventilation.
Ms. Agee admitted she was unhappy with the lack of specificity and vagueness in the inspection report and telephoned Rhea regarding the matters contained therein. Based on the inspection, Ms. Agee gave Speers a list of problems to address and complete before the closing. The record contains Plaintiff's Exhibit 5, which consists of a "List of Items Which Were Done" at the site and signed by Speers and Mrs. Rollins. Included were, "repaired rotten wood behind commode in gar. appt. [sic] and replaced commode;" and "cut hole in ceiling of gar. attic to gain access to attic." Ms. Agee testified that she requested that a hole be cut in the attic because of her concern about ventilation, as was noted in the inspection report. She sent a friend over to look into the attic for this purpose and testified that her friend said it was fine. Ms. Agee never personally checked the attic.
One week after the purchase, Ms. Agee contacted Durwood Lee, a building contractor, and asked him to give her an estimate on how much the remodeling would cost. Lee examined the property around October 1, 1997. He gave Ms. Agee a written estimate by letter wherein he discussed the problems he observed in the building and his estimate to make the necessary repairs.
Lee testified regarding his observations of the damage as a result of flooding and the substandard construction. The parties stipulated that Lee was an expert in the field of building, remodeling and construction. Lee's report notes exterior and interior problems he observed and photographed, which photos were introduced into evidence. According to Lee, the garage apartment had a sinking or sagging in the roof which was a result of using "one-bys" (a three-quarter inch thick material) as rafters. According to Lee, the use of "one-bys" would be a defect in the *411 construction of the roof since "two-bys" (an inch and a half thick material) are generally used as rafters. Lee observed that the concrete foundation of the building had no "footing" to carry the weight of the building and the posts of the building were imbedded in concrete allowing an area for termites to enter. Lee observed improperly placed rafters, damaged wall framing due to water or insects and deteriorated or missing stud framing along the south wall of the bathroom, and the uninstalled plumbing for a tub and toilet,[1] as well as other defects.
Lee's estimated cost of repairs of the rafters and ceiling joists, damaged walls and roof was $15,300. Lee's report stated that an exact cost could only be obtained from an engineer. Ultimately, Ms. Agee did not hire Lee to do the work. Instead, she obtained the help of her brother.
Ms. Agee's brother, Thomas "Joe" Agee, first discovered the water damage in the bathroom of the garage apartment. Agee testified that he was a carpenter and had been in the construction industry since he was 17. He went over to the house to help his sister remodel. They decided to remove the paneling from behind the toilet in the garage apartment bathroom because there were some water marks around the bottom. The wall was paneled only to a height of 3½ feet, up to the chair railing. When they removed the paneling, they discovered gaping holes in the sheetrock behind the toilet and sink. The sheetrock was water-soaked, and the wooden framing was water and termite damaged. This damage had been covered over with the paneling so that it was not visible unless the wallboard was removed. Agee then removed all of the sheetrock on the back wall to determine the extent of the damage and to make certain the studs were not damaged since it was a load-bearing wall.
This record adequately supports the factual findings of the trial court. We conclude, therefore, that the trial court was not manifestly erroneous in finding that the damaged and rotted wood and wall areas of the garage apartment and the substandard construction of the roof were redhibitory defects. These problems were not apparent without some destructive investigation of the building. Regarding the defective roof, although Rhea's inspection report notes that the roof was sagging and might need additional bracing, the report does not mention that the roof was constructed with substandard materials. The report notes that there was no attic access and that ventilation was needed with soffit and turbo vents. The hole was cut in the ceiling to allow access to address this problem after the inspection; Ms. Agee sent her friend over to make sure this was done. The access to the ceiling was not made to enable Ms. Agee, who is not a carpenter, to inspect the building materials. Accordingly, the trial court did not err in concluding that plaintiff was not aware that the roof framing was constructed with substandard materials.
The sellers failed to disclose the flooding problems, water damage and termite damage on the south wall of the apartment and apparently attempted to cover the rotted wall framing and wet sheetrock with paneling. Speers personally built the roof with substandard lumber and knew of the flooding problems and signed a statement that deliberately downplayed the condition. Moreover, it appears that Speers deliberately attempted to conceal the rotted wood framing on the south wall of the building. *412 Therefore, the finding of bad faith by the trial court was not manifest error.

Damages
Finally, appellants complain that the trial court erred in its calculation of damages. According to appellants, a reduction in the purchase price is a type of special damage that requires the court to establish the amount with mathematical certainty. See Winn v. Industrial Crane Rental, Inc., et al., 00-102 (La.App. 3d Cir.10/25/00), 772 So.2d 821.
At trial, Ms. Agee introduced approximately 70 receipts listing hundreds of items totaling $10,627.60. Ms. Agee testified that she agreed to pay her brother $4,500 to do the repair work. In view of what follows, it is interesting to observe that the amount she agreed to pay her brother, when added to the total of her receipts for materials, comes very close to the $15,300 amount estimated by Lee. The trial court determined, however, that not all of the invoices that Ms. Agee introduced as evidence of her expenses were used for repair of the garage apartment. Among the items purchased are items that are clearly unrelated to repair of the damages involved in this case, including foliage (plants), an oval rug, light fixtures, including a five-light chandelier, lattice, oak wall cabinets, and unreasonably large quantities of gypsum wallboard (50-4' × 8' sheets), paint, wall outlet covers and other hardware items, hand tools and power tools such as a power washer. The trial court listed some of these and our list of suspect items is by no means exhaustive.
Rather than using the receipts to reach an amount that was actually used in the repairs, the trial court reduced by one-half the total amount requested by Ms. Agee and awarded $7,500, plus attorney fees and costs. In the oral ruling on quantum, the trial court stated:
And looking at her [the plaintiff's] expense list, there are a number of items on here, which obviously aren't related to repairs; they're cosmetic in nature.... I do find, though, that even though her expense list is Ten Thousand and no/100 ($10,000.00) Dollars and her brother says he expected Four Thousand, Five hundred and No/100 ($4,500.00) Dollars or Five Thousand and No/100 ($5,000.00) Dollars for the repair, I don't believe that that's supported by the evidence. And I'm going to reduce the purchase price of this building in the amount of Seven Thousand, Five Hundred and No/100 ($7,500.00) Dollars, which I believe is appropriate under the circumstances....
Speers' contention that the trial court should have made a determination of exactly what was spent on repairs has some merit. The cost of repairs, however, is only a factor in reaching that decision. The reduction in price which the trial court may decree under C.C. art. 2541, et seq. is the difference between the sale price and the price a reasonable buyer and seller would have agreed upon if they had known of the defects. Ball v. Ford Motor Co., 407 So.2d 777 (La.App. 1st Cir.1981); Menville v. Stephens Chevrolet, Inc., 300 So.2d 858 (La.App. 4th Cir.1974), writ denied, 303 So.2d 186 (La.1974).
One of the principal elements in formulating the reduction of the sale price is the cost of the repairs. In sales of immovable property, the amount to be awarded is the amount necessary to convert an unsound structure into a sound one. Destefano v. Crump, 96-951 (La. App. 5th Cir.04/09/97), 694 So.2d 424.
However, a greater reduction is warranted when the defects are numerous and the repairs lengthy and frequent. This is so because a forewarned buyer would not *413 reasonably pay the full price, reduced only by the cost of the repairs, if he knew the extensive repairs of the defects would significantly curtail his use and cause him considerable inconvenience and aggravation. Menville, supra; Griffin v. Coleman Oldsmobile, Inc., 424 So.2d 1116, (La.App. 1st Cir.1982). In Griffin, the court stated that the damages awarded in a redhibition of this manner are the difference between the sale price and the price a reasonable buyer and seller would have agreed upon if they had known of the defects. While one of the principal elements in formulating the reduction of the sale price is the cost of the repairs, that is only a factor to consider, not a rigid rule to follow. Further, the amount of reduction of the purchase price is a question of fact for the trial court to determine.
The ultimate question of the existence of a redhibitory vice and the amount to be awarded as a reduction of the purchase price are questions of fact for the trial court, which should not be disturbed in the absence of manifest error or abuse of its wide discretion. Ford Motor Credit v. Laing, 30,160 (La.App. 2d Cir.01/21/98), 705 So.2d 1283; Destefano, supra.
In this instance, the trial court determined quantum by reducing the amount requested by one-half. The trial court found damages in the amount of $7,500 but did not articulate for the record exactly what factors were used in reaching that amount. Considering the lower court's wide discretion in determining the reduction of purchase price, we find that the amount awarded, $7,500, was not an abuse of that discretion.

Conclusion
For these reasons, the judgment of the trial court reducing the purchase price by $7,500 and allowing for attorneys' fees is affirmed at appellants' cost.
NOTES
[1] Mrs. Rollins testified by deposition before her death that the garage apartment bathroom contained a tub, commode and lavatory.