886 So.2d 1199 (2004)
John Wilson OLLIS and Linda Neu Ollis, Husband & Wife, Plaintiffs-Appellees
v.
Adam Edward MILLER and Mary Ann Nimm Miller, Husband & Wife, Defendants-Appellants.
No. 39,087-CA.
Court of Appeal of Louisiana, Second Circuit.
October 29, 2004.
*1201 Charles J. Neupert, Jr., Shreveport, for Appellant.
Katherine Clark Dorroh, for Appellee.
Before BROWN, CARAWAY, and DREW, JJ.
BROWN, C.J.
On January 10, 2000, plaintiffs, John and Linda Ollis, agreed to purchase from defendants, Adam and Mary Miller, a home located at 590 Waterford Place in Shreveport, Louisiana, for the price of $335,000. Prior to the closing, on January 17, 2000, plaintiffs had the property inspected by Jimmy Sitter, who noted numerous defects, including visible moisture rot on the front balcony and visible moisture effects (soft areas) on the east balcony. Prior to plaintiffs' taking possession, repairs were made to the posts on the front balcony. Based upon Sitter's recommendations, plaintiffs did not require that repairs be made to the east balcony. Thereafter, on February 1, 2000, plaintiffs purchased the property from defendants.
In the fall of 2000, plaintiffs hired Ken McDonald to repaint their home. As the painters were preparing the wood on the balconies, several problems were discovered. Plaintiffs hired a civil engineer to determine what repairs would be necessary. The following conditions were found:
Front balcony:
1. The lumber used to originally construct the cantilever beams was not pressure treated or designed for exterior use, resulting in severe wood rot.
2. Drywall mud, designed for interior use, had been used to fill in areas of rotted wood within the beams and spaces between the beams.
3. On the inside, the paint on the drywall had bubbled and peeled because of the dampness of the exterior conditions.
4. Supporting studs as well as the siding on the exterior of the second story of the house had to be replaced.
Side balcony:
1. The balcony had sustained internal fire damage which was not visible during the inspection conducted by plaintiffs prior to closing; this cause the porch to be structurally unsafe.
2. Damaged floor joists in the interior of the house had to be replaced, which also involved removing and replacing the floor decking on the second floor.
3. The ceiling of the bedroom below required repair.
4. The side balcony needed to be made smaller to enable connection to the new floor joists.
Plaintiffs filed suit against defendants in February 2001, seeking a reduction in the *1202 price of the home, together with damages, costs and attorney fees. After dismissing claims related to an allegedly defective septic system and inadequate spacing between sprinkler heads, the trial court found that defendants made repairs "in a fashion (that) amounted to an intentional concealment of the damaged areas." The court awarded plaintiffs repair costs in the amount of $24,980 and damages for inconvenience and aggravation in the amount of $5,000; however, the court reduced the total damage award by 15% because plaintiffs failed to call their painter and contractor, Kenneth McDonald, as a witness or offer his testimony by deposition which made it difficult for the court to determine the exact repairs made, together with the associated costs. Plaintiffs were also awarded expert witness fees in the amount of $2,000, together with attorney fees in the amount of $19,954.38. It is from this judgment that defendants have appealed. For the reasons set forth below, we amend the judgment in part and, as amended, affirm.

Discussion
There are two preliminary matters that bear on our analysis of whether plaintiffs established their redhibitory claim against defendants.
First, defendants argue that without the testimony of their painter and contractor, plaintiffs did not carry their burden of proof, and the trial court erred in finding in their favor. According to defendants, Ken McDonald's testimony was critical inasmuch as he was the person who inspected plaintiffs' home, estimated the necessary repairs, bid on the project, and then performed the repair work on the house.
An adverse presumption exists when a party having control of a favorable witness fails to call him to testify. Louisiana Safety Association of Timbermen Self Insurers Fund v. Malone Lumber, Inc., 34,646 (La.App.2d Cir.06/20/01), 793 So.2d 218, writ denied, 01-2557 (La.12/07/01), 803 So.2d 973. However, the adverse presumption rule is tempered by the fact that a party need only put on enough evidence to prove its case. Id.; State Farm Fire and Casualty Co. v. Torregano, 00-141 (La.App.5th Cir. 09/26/00), 769 So.2d 754. He may do so by calling one or more other witnesses concerning an issue. Wilson v. U.S. Fire and Casualty Co., 593 So.2d 695 (La.App. 4th Cir.1992), writs denied, 597 So.2d 1027, 1037 (La.1992).
For the reasons expressed further in this opinion, we find no merit to this assignment of error, inasmuch as the record contains sufficient testimony from the engineer, Jimmy Sitter, and John Ollis, as well as documentary evidence to support plaintiffs' claim. See Davis v. Puryear, 95-1637 (La.App. 4th Cir.05/01/96), 673 So.2d 1298, writ denied, 96-1380 (La.10/04/96), 679 So.2d 1381.
Second, defendants assert that the trial court erred in allowing into evidence written proposals and invoices prepared by Ken McDonald, who did not testify at trial as set forth above. According to defendants, the proposals and statements constituted inadmissible hearsay.
The proposals and invoices were introduced into evidence during the testimony of Mr. Ollis, who coordinated the repairs and paid for the work as it was completed. These documents were introduced as evidence of payments made by plaintiff to repair the home. Bills, invoices, and statements are admissible under the business records exception to the hearsay rule to prove damages. Carroll v. Coleman, 27,861 (La.App.2d Cir.01/24/96), 666 So.2d 1264; Fidele v. Crescent Ford Truck Sales, Inc., 00-1934 (La.App. 5th Cir.04/11/01), 786 So.2d 147. As noted by this court in Carroll, supra, invoices and *1203 bills are admissible to show a plaintiff's expenses or damages, not to show that the services or work was necessary or that the expenses incurred were reasonable. We find no error in the admission of this documentary evidence.
A more difficult consideration is the fact that the trial court reduced the total damages awarded to plaintiffs by 15% due to McDonald's failure to testify. Plaintiffs did not claim this as error and this is not before us at this time. It does, however, give credence to defendants' claim that plaintiffs failed to prove with exactitude their damages. We will address this issue later in this opinion.
Defendants next take issue with the ruling of the trial court finding that there were redhibitory defects in the home plaintiffs purchased from them.
The warranty against redhibitory defects is set forth in La. C.C. art. 2520, which provides:
The seller warrants the buyer against redhibitory defects or vices in the thing sold. A defect is redhibitory when it renders the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect. The existence of such a defect gives a buyer the right to obtain rescission of the sale.
A defect is redhibitory also when, without rendering the thing totally useless, it diminishes its usefulness or its value so that it must be presumed that a buyer would still have bought it but for a lesser price. The existence of such a defect limits the right of a buyer to a reduction of the price.
Article 2521 provides that a seller owes no warranty for defects that were known to the buyer at the time of the sale, or for defects that should have been discovered by a reasonably prudent buyer. Generally, the seller warrants the thing sold against hidden or non-apparent defects. La. C.C. arts. 2475, 2521. Apparent defects are those defects that the buyer might have discovered by simple inspection, while hidden or non-apparent defects are those which cannot be discovered by simple inspection. Rey v. Cuccia, 298 So.2d 840 (La.1974); McGough v. Oakwood Mobile Homes, 34,091 (La.App.2d Cir.11/01/00), 779 So.2d 793.
In order to determine whether a defect is apparent upon simple inspection, the court must use a reasonableness standard, i.e., whether a reasonably prudent buyer acting under similar circumstances would have discovered the presence of a defect. McGough, supra. A buyer is only under a duty to make an inspection that is reasonable in light of all the circumstances surrounding the sale. Whether an inspection is reasonable depends upon the facts and circumstances of each case and includes such factors as the knowledge and expertise of the buyer, the opportunity for inspection, and the assurances made by the seller. Rey, supra; McGough, supra; Creger v. Robertson, 542 So.2d 1090 (La.App. 2d Cir.1989); Sells v. Puls, 97-1483 (La.App. 3d Cir.04/22/98), 711 So.2d 432. The buyer, however, is under no obligation to inspect with expertise or to deface the thing purchased while inspecting it. McGough, supra.
John Ollis, a self-proclaimed house husband, testified that he and his wife purchased and moved into the home at 590 Waterford in February 2000. He described their house hunt as a rushed process, inasmuch as his wife had accepted a position as Chief Operating Officer of Christus Schumpert Medical Center and they were relocating from Dallas to Shreveport.
*1204 Ollis and his wife went through the house only once in late December 1999 or early January 2000. He testified that the home at 590 Waterford was built in the Acadian style, consisting of five bedrooms and four and one-half baths, with an area of approximately 4400 square feet. The front balcony is supported by cantilever beams and runs the length of the second story of the home. On the east side is another balcony off a second story bedroom.
Prior to closing on the home, plaintiffs had an inspection performed by Jimmy Sitter of Building Inspections Plus. Sitter issued a report dated January 17, 2000, in which he noted that he performed a visual inspection of the home to identify areas which needed immediate or major repairs. Specifically excluded were areas which were not exposed to view, concealed or otherwise inaccessible. In his report, Sitter noted that the wood posts on the front porch balcony had visible moisture rot at their bases. Before plaintiffs moved in, defendants addressed this concern by replacing the bases of the posts. Sitter also observed on the side balcony visible moisture effects to the wood timbers with soft areas. Ollis testified that he and Sitter discussed this, and the inspector informed him that this condition was not nearly as severe as the rot noted on the front porch posts.
When he and his wife moved in, Ollis observed that the bottom portion of the front balcony posts had been replaced inasmuch as no rot was visible. Likewise, he didn't see any signs of wood rot on the side balcony, although he did see the visible moisture effects as described by Sitter.
The Ollises decided to have some work done on their home in the fall of 2000. Plaintiff noted that as early as June or July 2000, the paint on both balconies had begun to bubble and deteriorate at a rapid rate. Plaintiffs hired Ken McDonald, who had done some work for them following the Easter hail storm, to paint the balconies and kitchen ceiling. As he began work on the balconies, McDonald started noticing severely rotted areas, and the damage unfolded as the painter continued his work.
At that time, Ollis began documenting the situation by taking photographs, which were introduced into evidence at trial. These pictures depicted the following conditions: beams filled in with plaster of Paris; severe dry rot in most of the beams on both balconies; charred timber on an interior weight-bearing beam; fire damage to a wall and to the beams underlying the bedroom floor; and, inter alia, cracked beams which had been spliced together with 2 × 4s and/or 2 × 6s.
Ollis noted that the beams on the front and side balconies run into the structure of the home, all the way to the opposite wall of the bedroom they border. He also observed that several of these beams were weight-bearing, providing support and stability to the home. It was then that plaintiffs hired structural engineer Paul Cormier, who from that point on coordinated the repair work to the home. According to plaintiff, he retained the services of Cormier once he realized the work entailed a good bit more than just a paint job. Ollis and McDonald knew that the side balcony required replacement, but they weren't exactly sure how to facilitate that.
Ollis identified the disclosure statement signed by the Millers and pointed out the negative responses to questions about knowledge of dry rot, remodeling/ repairs, or fire damage. Plaintiff then testified that he and his wife relied on the disclosure statement in deciding to purchase defendants' home.
*1205 Introduced next into evidence were McDonald's written estimates and copies of checks paid to McDonald in connection with his repair work. Ollis noted that there were copies of each and every payment he made for repairs. He testified that he was present most of the time that McDonald worked on the house, which began in mid-September 2000 and continued through early 2001. Likewise, he was at the home when Cormier and McDonald discussed the work which had to be done to make the home structurally sound. Ollis pointed out that Cormier consulted on the structural adequacy work-once that phase was over, it was then simply a matter of restoring the home to a presentable condition. Cormier gave the project his approval in January 2001, and the restoration phase began.
Ollis testified that there were areas in which the siding on the house had to be replaced because of the extent of repair work required by the rotted areas. Also, there were shutters and a balcony door which had to be replaced. He noted that the only work done was that necessary to restore the home to a good condition. Had he known of the extent of the dry rot and fire damage, as well as the extent of the work required to repair both balconies, Ollis stated that he would not have paid $335,000 for the home. The extent of the damage and necessary repairs were a shock to both him and his wife, who thought they had found their dream house. During the repair and restoration process, which lasted about nine months, they had no privacy and had to endure constant noise and confusion.
On cross examination, plaintiff stated that their purchase offer was contingent upon receipt of a satisfactory, complete inspection of the home. Ollis noted that he and his wife relied not only upon the inspector's report, but upon the sellers' disclosure statement in deciding to buy the house. As was testified to by the inspector, during Ollis's walkthrough of the home, he stated that he did not detect any moisture rot on either of the two balconies. He did take Sitter's recommendation that the bases of the posts on the front balcony be replaced as they did show signs of moisture rot. As far as he knows, defendants' realtor handled this repair.
In response to a question regarding the necessity of replacing french doors on the side balcony, Ollis noted that these doors had to be replaced because there was work that had to be done under them, specifically, the replacement of wood damaged by fire and seepage. Ollis reiterated that the condition of the side balcony deteriorated very rapidly, which surprised him. He was adamant that his contractor did not damage any of the balcony structure while working on the porch. Instead, the beams, which had sustained severe rot, just fell apart and had to be replaced.
Plaintiffs' counsel then called John Miller on cross examination, who testified that he and his wife had lived in the Waterford home for about ten years before its sale to plaintiffs. When defendants learned that Miller would be retiring from General Motors, they decided to downsize and relocate to Hot Springs.
Discussing the fire damage discovered on the side balcony, Miller stated that this was caused by a smoldering screw during the July 1999 repairs. According to defendant, while replacing dry rotted areas in one of the load-bearing beams, a screw began smoldering and smoking. His wife called the fire department to make sure there had been no smoke damage to the interior of the home. By the time the firemen arrived, he had put water on the area that was smoldering and he asked the firemen to try to get the smoke out of the house. The firemen recommended that *1206 they cut out an area in the floor where the smoldering occurred to determine whether there was anything sparking or smoldering underneath. When they did this, they didn't find any further damage.
The repair work that summer also included removal of dry rot from several beams on the front balcony. Defendant and his carpenter, Roger Varnell, rebuilt the dry rotted beams on both porches with new wood, using six inch galvanized screws to connect the new portions to the existing beams. When asked whether he had a contractor to oversee the repairs, defendant opined that the carpenter's work was adequate to support the two balconies. Miller testified that Varnell did all of the carpentry repair work on the beams on both porches, while he filled in with wood bonding material and painted the beams to seal the areas and protect from water damage, not to cover up dry rot.
Miller stated that prior to the summer 1999 repairs, he had repaired the beams on the balconies two previous times to remove dry rot. He replaced the rotted areas with new wood and bonding material recommended by a man at Home Depot. According to defendant, the materials did not fail; the problem was that water was getting in through the tops of the screws. During the summer 1999 work, Miller sealed the screws with urethane to prevent further damage.
Miller denied giving false answers on the disclosure statement. He pointed out that this document was filled out in July 1999; at that time, the dry rot had been removed and the beams repaired. To him, that indicated that there was no damage due to existing dry rot. He also defended his answer to question 10, stating that the repair work they did on the beams was not an addition, remodel, structural change or alteration, and therefore did not have to be disclosed. Miller felt the same way about the fire damage; because it had been addressed, it did not have to be disclosed. To him, these repairs were simply normal home maintenance. Based on this rationale, defendant testified that he did not disclose any of these problems or repairs to the realtor, inspector, or plaintiffs.
Roger Varnell, the carpenter who did the repair work for the Millers in the summer of 1999, testified next. He described that particular job as involving the repair of rotted wood on both balconies. At the start of the job, the beams were in good condition except for sections which had rotted through. Varnell stated that he repaired the decayed sections below the flooring with pressure treated lumber. He noted no sagging on the balcony or deck.
Varnell pointed out that his job involved wood replacement. To that effect, he anchored the replacement wood to the solid areas with galvanized wood. During the repair work on the side balcony, while grinding some nails off existing beams, some sparks flew into a hole and smoldered on top of one of the 2 x 12s. When he and Miller saw the smoke, they watered the area. When the firemen recommended that they check underneath the flooring, they did so and saw a charred area, but because that area wasn't load bearing, they did nothing, just replaced the flooring.
On cross examination, Varnell observed that the 1999 work was the only time he worked on the balcony beams; he wasn't involved in Miller's prior repair work. Likewise, he did none of the sealing or filling work, nor did he paint the beams. When asked whether he noticed the rotted condition of the beams he did not work on, Varnell noted that this was not obvious inasmuch as the other beams were still painted and covered up with plaster or bonding material.
*1207 Paul Cormier was the structural engineer who coordinated the repairs undertaken by plaintiffs. Cormier stated that he performed a structural inspection on the home, specifically, the two balconies. Introduced into evidence were his field notes and final report. On October 30, 2000, Cormier inspected the front balcony. He opined that some of the beams had to be replaced because of splicing, areas of dry rot, and repairs which had been made with wood that was not pressure treated. Cormier stated that he was very concerned with the way that 2 x 6s and 2 x 12s had been connected to the existing beams; to him, it appeared that the new portion and old structure were held together with drywall mud. He saw no evidence whatsoever that there were screws holding the beams together. On the front balcony, six of the 13 beams showed various degrees of patching and needed replacing. Cormier pointed out that during prior repairs, the wood rot had been cut out of the middle of the beams, with 2 × 6s being spliced in as "scabs" or patches. This type of repair was structurally inadequate and unsafe.
Cormier also examined the side balcony, finding pretty much the same thing  wood rot which had been patched with untreated wood and drywall mud. However, he also noted previous fire damage under the bedroom bordering the side balcony. Although these beams didn't have load bearing capacity, Cormier felt they needed to be replaced because the fire had burned one of the 2 × 12 joists holding up the flooring for the second story bedroom, as well as the beam running to the outside of the house. Cormier recommended replacement of the balcony if it were to continue being used as a porch. Specifically, he suggested replacement of the floor joists in the house underneath the plywood floor, as well as the beams holding up the balcony. To access the floor joists, the bedroom flooring would have to be removed and replaced.
Cormier felt that from a structural standpoint, none of the repairs undertaken by plaintiffs were excessive or unnecessary. He pointed out that certain structures, such as the siding and french doors, had to be removed during the repair process, either because of damage sustained during the work or because the new dimensions were slightly different.
Jimmy Sitter, who performed the inspection prior to plaintiffs' purchase of the home, testified that his inspection was limited to a visual inspection of areas not concealed or inaccessible because of walls, floor coverings, floors, etc. He clarified that an inspection is not a guaranty or warranty against any future latent defect, which is anything hidden or not revealed as a repair or replacement in the past life history of the home.
Sitter testified that his inspection report contained his recommendation that the wood posts on the front balcony be replaced due to visible moisture rot at their bases. He also observed visible moisture effects to wood timbers with soft areas on the side balcony. Sitter stated that the difference between moisture effects and visible moisture rot is that with moisture effects, the wood itself is soft on the surface to about ½ inch deep, which is insufficient to constitute wood rot. What he saw on the side balcony when he performed his inspection were soft areas, timbers and overall age and deteriorated conditions normal for the house being exposed to the weather. He didn't observe similar conditions on the front balcony at the time of the inspection.
Sitter stated that information about the previous repairs to the beams would have caused him to then look closer at the structural conditions of the balconies. Likewise, had the fire damage been disclosed, *1208 he would have examined more closely the structural integrity of the side deck. Had Sitter known of the repairs and fire damage, he would have asked the sellers for a copy of the repairs made as well as the extent of the damage. He reiterated that Miller did not disclose either the repairs or the fire damage to him.
Once plaintiffs' contractor, Ken McDonald, began to uncover the damage on the front balcony, Ollis called Sitter to come back. On the front balcony, he saw beams with visible water and rot damage. He noted that several of these beams had been spliced in with framing timbers or patched with drywall compound material. The beams he was called out to examine had to be replaced. Sitter opined that this damage, which was revealed only after the paint and bonding material was removed, had occurred over a long period of time.
The existence of a redhibitory defect is a question of fact that is not to be disturbed unless the record establishes that the finding is manifestly erroneous. McGough, supra; Ford Motor Credit v. Laing, 30,160 (La.App.2d Cir.01/21/98), 705 So.2d 1283. Likewise, the determination of whether a defect is apparent by reasonable inspection is a factual determination that will not be disturbed unless it is clearly wrong. Id.
The above testimony clearly establishes that the home contained hidden defects at the time of sale which were not readily apparent upon inspection by a reasonably prudent buyer. We do not find error in either conclusion made by the trial court, i.e., that the home contained redhibitory defects and that these defects were not apparent by reasonable inspection.
Defendants also argue that plaintiffs failed to prove with any certainty the damages to which they were entitled.
In the instant case, plaintiffs sought and were awarded a reduction in the purchase price they paid for their home, together with damages, costs and attorney fees. As noted above, the price reduction that may be demanded under La. C.C. art. 2541 is the difference between the sale price and the price that a reasonable buyer would have paid had he known of the defects. Capitol City Leasing Corp. v. Hill, 404 So.2d 935, (La.1981); Agee v. Speers, 35,600 (La.App.2d Cir.12/19/01), 803 So.2d 406. As was done in this case, the amount awarded is typically the cost of repairs, or the amount necessary to convert an unsound structure to a sound one. Agee, supra.
The amount awarded for a reduction of the purchase price is a question of fact for the trial judge which will not be disturbed in the absence of manifest error or abuse of discretion. Sells, supra; Destefano v. Crump, 96-951 (La.App. 5th Cir.04/09/97), 694 So.2d 424.
The record in this matter does not reflect manifest error or abuse of discretion on the part of the trial court in calculating the price reduction and damages to which plaintiffs are entitled. Each repair and expenditure was discussed by Ollis during his testimony. In fact, he excluded several items as being unrelated to the balcony repairs. Although McDonald was the best witness as to these costs, we feel that the testimony of Ollis supports a reduction in price as found by the trial court.
Defendants' last assignment of error is that the attorney fees awarded to plaintiffs in this case are excessive. According to defendants, an award of attorney fees in the amount of $19,954.38 in a matter in which the total recovery is $25,483 is unreasonable on its face. We agree.
*1209 Successful claimants in a redhibition action may recover reasonable attorney's fees incurred in bringing the action if the seller knew or should have known of the defect in the object or thing that was the subject of the sale. La. C.C. art. 2545; Linoski v. Fleetwood Homes of Texas, # 12, 38,338 (La.App.2d Cir.05/12/04), 873 So.2d 886; Dailey v. The Home Furnishings Store, 02-1225 (La.App. 4th Cir.09/17/03), 857 So.2d 1051. Whether a seller is in bad faith is a question of fact subject to the manifest error standard of review. Smith v. Max Thieme Chevrolet Company, Inc., 315 So.2d 82 (La.App. 2d Cir.1975); Chaudoir v. Porsche Cars of North America, 95-729 (La.App. 3d Cir.12/06/95), 667 So.2d 569, writ denied, 96-0800 (La.05/31/96), 673 So.2d 1033.
While the trial court has great discretion in awarding attorney fees in a redhibition case, such an award must be reasonable, based upon the degree of skill and work involved in the case, the number of court appearances, the depositions, and the office work involved. Linoski, supra; Gaston v. Bobby Johnson Equipment Co., Inc., 34,028 (La.App.2d Cir.11/03/00), 771 So.2d 848; Frentress v. Howard, 31,609 (La.App.2d Cir.02/24/99), 728 So.2d 1019.
Reasonableness of an attorney's fee is to be determined by the factors set forth in Rule 1.5(a) of the Rules of Professional Conduct, which include: (1) the time and labor required, the novelty or difficulty of the issues, and the skill required to properly perform the legal services; (2) the likelihood, if apparent to the client, that the matter will preclude other employment; (3) the fee customarily charged in the locality for similar services; (4) the amount involved and results obtained; (5) the time limitations involved by the client or circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer; and (8) whether the fee is fixed or contingent. Linoski, supra.
In a redhibition action, reasonable attorney fees are awarded to justly compensate plaintiffs who succeed in establishing liability on the part of a bad faith seller under La. C.C. art. 2545. Linoski, supra. As this court recently observed, an award of attorney fees encourages both plaintiffs to pursue meritorious redhibition actions and attorneys to represent plaintiffs with solid claims. Furthermore, an attorney's fee award in addition to damages discourages sellers and manufacturers from selling shoddy, defective products in the marketplace. Linoski, 873 So.2d at 889.
In this case plaintiffs' counsel submitted three invoices. One pre-trial invoice listed 55.50 hours and expenses of $1,060.35; another invoice showed expenses of $488.50; and an invoice for the month of January 2003, which included the trial but without an hourly breakdown or details as to how counsel spent her time working on the case. We note that the expenses listed included filing fees, miscellaneous court charges, and subpoena fees which were taxed to defendants in the judgment.
After an analysis of the above factors and principles of law, we agree with defendants that an attorney's fee of almost $20,000 in a redhibitory case in which plaintiffs' total recovery was under $26,000 is patently unreasonable. An action in redhibition to reduce the purchase price is not a complicated matter. Keeping this in mind, and considering the fact that plaintiffs' attorney did not submit detailed time records showing her hourly fee or a breakdown of her time, i.e., hours spent in preparation, hours spent in trial, etc., we reduce the attorney fee award to $12,000.

*1210 Conclusion

For the reasons set forth above, the attorney's fee awarded to plaintiffs is reduced to $12,000. In all other respects, the judgment of the trial court is AFFIRMED.