MOORE, J.
|TThe buyer, James Michael Cameron, appeals a judgment that rejected his claim for damages for breach of contract, awarded only $2,500 in redhibition for a defective fireplace in the house, and denied his claim for attorney fees. For the reasons expressed, we affirm.

Factual Background

The seller, Michael Bruce, had bought the house and 2.5-acre lot on McCutcheon Street in Shreveport’s Pinecroft Subdivision in 1976. He testified that at the time, it was a “shell” of a house sitting on piers and beams in the front of the lot; he hired a professional house mover to move it to the rear of the lot and set it on piers and beams. Over the next two years, with the help of a hired carpenter, Bruce added rooms to three sides of the house and installed brick veneer. He testified that he had been buying and remodeling houses as rental properties since 1971, but this one was to be his residence; he and his family lived there 18½ years. In the late 1990s he moved out and began renting the house to tenants, the last being his ex-wife and son. In 2001, he decided to sell the house, listing it with Century 21 agent Sharon Hutchinson.
Cameron saw the house on Century 21’s website and was attracted to it not just because of the house but the large freestanding garage, which he could convert to a metalworking shop, and the 2.5 acres on which he could plant Christmas trees for additional income. Before making an offer, he toured the house for 15-20 minutes and thought everything looked fine. He never met Bruce, however, until the closing on December 4, 2001; all communications were between Bruce’s seller’s agent, Ms. Hutchinson, and | ..Cameron’s buyer’s agent, Billy Crownover (also a Century 21 agent).
On October 29, Bruce filled out a sellers disclosure statement admitting that he had made “additions, structural changes, or alterations to the property,” for which “permits and approvals in compliance with building codes” had been obtained, and denying any knowledge of “termites, dry rot, or pest on or affecting the property.”
*590 On November 1, Cameron offered $92,000 for the property; Bruce accepted the next day. A contract addendum dated November 2 listed five items that Bruce was to repair or replace. Of significance to this appeal is No. 5, typewritten as “The fireplace is to be brought into a safe and normal operation” and handwritten as “Replace cap on fireplace chimney.” Bruce testified that he made all these listed repairs, including the chimney cap, and had no idea there was any further problem with the brick fireplace.
On November 9, Cameron hired HouseMasters Home Inspections to inspect the house; this turned up a number of additional problems. Cameron drafted a second contract addendum, dated November 14, listing 10 more items that Bruce was to repair or replace. Of significance to this appeal are the following, next to which someone made the handwritten notations printed here in italics:
4. SUB-STRUCTURE: Replace the broken pier near the entry of the sub-structure. OK but someone will have to show what to do.
5. Repair/replace the “several” floor joist [sic ] below the living room and center bedroom insuring the flooring is level. Show him * * *
9. EXTERIOR ELEMENTS: (settlement cracking) repair the cracks noted at the right side below the Isgable and at the rear center window. Insure any settling problems are corrected to include if necessary leveling the entire structure. Can’t do this.
Neither party knew who made the handwritten notations, perhaps one of the real estate agents, and Cameron testified he did not see them until after the closing. Nevertheless, Bruce testified that he met with the inspector from HouseMasters, who took him under the house and showed him the cracked pier and which joists were sagging. Bruce testified that he promptly “scabbed” several boards and added half a dozen joists, and made all the other repairs by November 19, except for No. 9. He testified that had he been required to level the whole structure, he would have “backed out” of the deal.
Shortly before the closing on December 4, Cameron handwrote a third contract addendum asking Bruce to replace two outdoor lights in the backyard (this had been item No. 1 in the second addendum). Bruce testified that he completed this just before the closing, and Cameron agreed that the new lights were in place. The parties closed the sale and Cameron moved in with his family.
Cameron and his wife began noticing problems about three months later, after they removed two interior walls and pulled up some carpet. This showed the floor slightly sagging in the livingroom and hall area, and “bouncing” when they walked over it. They then noticed the fireplace was cracking and separating from the wall, with only the roof beams keeping it from tumbling down.
|4In October 2002, Cameron hired a civil engineer, Don Durr, who found that the fireplace had no piers under it and that several beams were sagging under the weight. He advised installing four piers under the fireplace, jacking up the joists to a level position and adding several new beams.

Procedural History and Evidence at Trial

Cameron filed this redhibition suit against Bruce in December 2003; he later amended the petition to add HouseMasters as a defendant for failing to find the structural defect under the fireplace. HouseMasters obtained a partial summary judgment limiting its liability to $1,000, but this *591 court reversed and remanded. Cameron v. Bruce, 42,873 (La.App. 2 Cir. 4/23/08), 981 So.2d 204, writ denied, 2008-1127 (La.9/19/08), 992 So.2d 940. HouseMasters later settled with Cameron.
The case was tried over two days in August 2011. In addition to the testimony outlined above, Cameron called several expert witnesses. Jimmy Sitter, a building inspector who examined the house in 2006, generated a long list of defects, including that there was too much space between the beams, several floor joists under the living-room floor had been spliced instead of replaced, and one of the piers was tilted; all of this contributed to the “bounce” in the floor and needed repair. Don Durr, the civil engineer, found one cracked pier, four joists deflected, one joist cracked, and a sag under the fireplace because it had no foundation. Sammie Craft, another civil engineer, examined the house in March 2004; he corroborated Sitter’s and Durr’s findings and suggested hiring a foundation company to level the | Spiers. None of these witnesses thought that any of the joists or beams had been replaced or properly repaired. Dean Cole, wee-president of Interstate Foundation, testified that at today’s prices, repairing this foundation would cost $6,995, even though the normal cost for a pier-and-beam house was $2,500 to $4,000. Darrell Barnhill, a contractor, generated an estimate for all the repairs suggested by Sitter, Durr and Craft; this came to $188,000, not including the foundation repair.
Cameron testified that owning the house had been financially and emotionally devastating. Not only had the costs of inspections and repairs added up, but he had declined to sell his mineral rights for $56,000 at the height of the Haynesville Shale boom. He testified that he did this on the advice of an attorney who felt the title was clouded by this litigation.
Bruce testified that the house mover had moved the structure, including the fireplace and foundation, in 1976, and he (Bruce) never did any structural work until he went in the crawlspace with the HouseMasters inspector in 2001. He insisted that he had indeed “scabbed”[1] some of the boards; he could not explain why Cameron’s experts saw no recent work on the substructure, except that they were looking perhaps five years later. Bruce’s ex-wife, Gloria, testified that as long as she lived in the house (from 1979 to 1990 and then for six months in 2001) she noticed no problem with the fireplace or any sag or bounce in the floor.
Bruce also called three experts. Matt Snyder, a realtor and rental property manager, testified that at 1,842 square feet on 2.5 acres, the house |fihad an average rental value of $950 a month, based on compa-rables. Clyde Brossette, a real estate appraiser, testified that when he appraised the house in November 2001, it was worth $96,839 (using the cost method) or $94,000 (comparables method). Philip McDonald, a termite inspector, examined the house in November 2001 and found evidence of old termite damage which had been treated; there were no active termites.

Action of the District Court

The district court gave oral reasons for judgment, finding that both parties were “nice gentlemen” who had been ill served by their respective real estate agents. The court found no meeting of minds as to the items in the three contract addenda, and the only issue at closing was replacing the two backyard lights. The court concluded there was no breach of contract, as *592 there was no agreement as to the items in the addenda.
On the redhibition claim, the court found the seller was not in bad faith, so no attorney fees could be awarded. However, the absence of piers under the fireplace was a redhibitory defect which the seller was obligated to repair. The court awarded $2,500, “the best estimate that I can come up with” from Interstate Foundation’s proposal. Finally, the court expressed its regret for the “wrong advice” Cameron received regarding the Haynes-ville Shale.
Cameron has appealed, raising three assignments of error.

Discussion: Breach of Contract

By his first assignment of error, Cameron urges the district court erred in holding that Bruce did not breach the sales contract and thus was 17not liable to Cameron for damages and attorney fees. He identifies three areas of breach. First, Bruce breached the sellers disclosure statement by failing to disclose that he had moved the house from the front to the rear of the lot, cut it in half to effect the move, and then added rooms to it, and that the house had been infested with termites; these omissions had a material and adverse effect on the value of the house. Second, Bruce breached the contract addenda by failing to repair or replace several floor joists below the livingroom and to bring the fireplace into a safe and normal operation; repairing the substructure was the most important part of the addenda, yet all Bruce did was to replace the fireplace cap and “scab” the joists around it. Third, Bruce breached the buy-sell agreement by selling a house with a redhibitory vice, lacking piers under the fireplace; this, he contends, activated the attorney fee provision (line 78) of the buy-sell agreement.
Bruce responds that the district court’s factual findings regarding a meeting of the minds cannot be disturbed unless they are manifestly erroneous. Clark v. Christus Health N. La., 45,668 (La.App. 2 Cir. 9/22/10), 47 So.3d 1135. He shows that neither the contract addenda nor the HouseMasters report mentioned any need for repairs to the substructure under the fireplace, and this supports the court’s finding that no meeting of the minds occurred as to the lack of support for the fireplace. He also submits that the minor redhibitory defect found by the court does not constitute a breach of contract.
Interpretation of a contract is the determination of the common intent of the parties. La. C.C. art. 2045. When the words of a contract are clear |sand explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties’ intent. La. C.C. art. 2046; Campbell v. Melton, 2001-2578 (La.5/14/02), 817 So.2d 69. Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole. La. C.C. art. 2050.
When a contract can be construed from the four corners of the instrument without looking to extrinsic evidence, the question of contractual interpretation is answered as a matter of law. Prejean v. Guillory, 2010-0740 (La.7/2/10), 38 So.3d 274; El-ston v. Montgomery, 46,262 (La.App. 2 Cir. 5/18/11), 70 So.3d 824, writ denied, 2011-1292 (La.9/23/11), 69 So.3d 1165. Nonetheless, factual findings that pertain to the interpretation of a contract will not be disturbed absent manifest error. Campbell v. Melton, supra; Elston v. Montgomery, supra.
Cameron’s main argument is that Bruce breached the contract by failing to install piers and beams under the fireplace. We have closely examined the buy-sell agreement and the three contract ad *593 denda and, with the district court, do not find that the parties had a meeting of minds for Bruce to add substructure under the fireplace. As noted above, the only reference to the fireplace was in the first addendum, where Cameron asked that the fireplace be “brought into a safe and normal operation,” and Bruce agreed to “replace cap on fireplace chimney,” which he did. The second addendum called for Cameron to replace “the broken pier near the entry of the sub-structure” and “repair/replace ‘several’ floor joists below the living room and center bedroom insuring the floor is level”; Cameron agreed and [ testified that he did these. Of course, Cameron’s building inspector, Jimmy Sitter, and contractor, Darrell Barnhill, found the joists spliced instead of replaced, but this record supports a finding that splicing or “scabbing” substantially complied with the addendum to “repair/replace” the joists. The salient point is that neither the buy-sell agreement nor any of the three addenda specified adding new piers, beams or joists under the fireplace.
Admittedly, the second addendum includes Cameron’s request to “insure any settling problems are corrected to include if necessary leveling the entire structure.” Someone handwrote next to this (obviously on Bruce’s behalf), “Can’t do this,” and Bruce testified that leveling the entire foundation was such a large undertaking that it would have killed the deal. Although Cameron insisted he was unaware of the notations on the second addendum, he signed it on November 19 and signed the cash sale deed on December 4. The record fully supports the district court’s finding that there was no meeting of minds as to leveling the entire foundation. We perceive no manifest error.
Cameron also argues that omissions from the sellers disclosure statement constituted a breach of contract. Although Bruce disclosed that he had made “additions, structural changes, or alterations,” the statement provided no details, and it denied “termites, dry rot, or pest” on or affecting the property. Omissions from a disclosure statement, if serious enough, can indeed supply proof of a redhibitory vice and the seller’s bad faith, as in Ollis v. Miller, 39,087 (La.App. 2 Cir. 10/29/04), 886 So.2d 1199. However, the trial court is entitled to find substantial compliance with the | mdisclosure statement and to reject a claim of rescission for a technical violation, as in Clement v. Graves, 2004-1831 (La.App. 1 Cir. 9/28/05), 924 So.2d 196. While more detail about the additions and structural changes would have been helpful, the district court was entitled to find that a comprehensive list of improvements to a nearly 60-year-old house would be impracticable. And while the disclosure statement denied knowledge of termites affecting the property, the next line of the statement referred to termite treatment “in the past 3 years,” which may have led Bruce to think that disclosure of only recent termite activity was requested. On this record, we do not find violations serious enough to rescind the contract.
Cameron’s final argument is that the existence of the redhibitory defect equated to a breach of contract, thus activating the attorney fee provision of the buy-sell agreement. However, an action for breach of the warranty of fitness, unlike other contractual breaches, is founded in redhibition; even the presence of an express warranty does not convert such an action into one for breach of contract. Manning v. Scott-Hixson-Hopkins Inc., 605 So.2d 233 (La.App. 2 Cir.1992); Berman Daferner Inc. v. Causey, 97-1647 (La. App. 1 Cir. 9/25/98), 723 So.2d 467; PPG Industries Inc. v. Industrial Laminates Corp., 664 F.2d 1332 (5 Cir.1982). The award or denial of attorney fees depends *594 on a finding of bad faith under La. C.C. art. 2531, which we will discuss in conjunction with Cameron’s third assignment of error. The first assignment of error lacks merit.

|^Bruce’s Status as Manufacturer

By his second assignment of error, Cameron urges the court erred in failing to find Bruce was a manufacturer under La. C.C. art. 2545 and thus failing to find him liable for damages and attorney fees. Cameron argues that Bruce made such extensive repairs to the house-in fact, he made a living buying old houses and refurbishing them for rental-that he should be deemed a manufacturer, as occurred in Foust v. McKnight, 95-2008 (La.App. 1 Cir. 5/10/96), 675 So.2d 1147, writ denied, 96-2117 (La.11/8/96), 683 So.2d 277, and Goodman v. Roberts, 587 So.2d 807 (La.App. 3 Cir.1991). Cameron also cites Bruce’s admission on cross-examination (“you really became your own builder” and “acted as your own contractor to do the building” of his other rental houses) and concludes that this activates Art. 2545’s presumption that he knew of the defects in the thing sold.
Bruce responds that Foust and Goodman do not establish a bright-line rule that anybody who remodels a house is a manufacturer for purposes of Art. 2545. Critically, Bruce did not install the fireplace and cannot be charged with knowledge of the defects in its construction.
A seller is deemed to know that the thing he sells has a redhibitory defect when he is a manufacturer of that thing. La. C.C. art. 2545; Aucoin v. Southern Quality Homes LLC, 2007-1014 (La.2/26/08), 984 So.2d 685. A vendor-builder of a residence is a manufacturer who cannot avoid the conclusively presumptive knowledge of defects in the thing he manufactures. Cox v. Moore, 367 So.2d 424 (La.App. 2 Cir.), writ denied, 369 So.2d 1364 (1979). The trial court’s factual findings in a redhibition |,2claim may not be set aside in the absence of manifest error or unless they are plainly wrong. Aucoin v. Southern Quality Homes, supra; Doge v. Obed, 40,414 (La.App. 2 Cir. 12/14/05), 917 So.2d 713.
Bruce was obviously not a homebuilder or a contractor and thus not presumptively a manufacturer under Art. 2545. The record shows, however, that he either performed or directed significant remodeling of the house, thus raising the possibility that his involvement elevated him to the status of a manufacturer even without the presumption of Art. 2545. In Gaston v. Bobby Johnson Equip. Co., 34,028 (La.App. 2 Cir. 11/3/00), 771 So.2d 848, this court approached the question of whether a mechanic, who adapted and installed a rebuilt engine in a dump truck, was a manufacturer of the engine by reference to the definition of “manufacturer” in the Louisiana Products Liability Act, La. R.S. 9:2800.53(1).[2] Applying these principles, *595 we find no manifest error in the district court’s conclusion that Bruce was not a manufacturer. He was not in the business of building houses for placement into trade or commerce, and he did not label the house as his own product. Although Bruce might have been a manufacturer of those portions | lsof the house that he added or significantly remodeled, he did not build the substructure under the fireplace — thus distinguishing the case from Foust v. McKnight, supra, and Goodman v. Roberts, supra, where “inadequacies of the installation and renovation * * * resulted in the [redhibitory] defects,” 587 So.2d at 810. On this record, the district court was not plainly wrong to find that Bruce was not a manufacturer of the house. This assignment of error lacks merit.

Damages and Attorney Fees

By his third assignment of error, Cameron urges the district court erred in awarding damages of only $2,500 and denying attorney fees. He cites his expert contractor Darrell Barnhill’s estimate of $188,000 to fix everything in the house and his expert foundation repairman Dean Cole’s estimate of $6,995 to level the piers and beams. He also cites his attorney’s pretrial affidavit claiming fees and costs of $51,502.08, argues that trial fees ran to $10,600, and requests a reasonable amount for this appeal.
Bruce responds that because he was not a manufacturer and was not found to be a bad-faith seller, the denial of attorney fees was proper. He also submits that the award of $2,500 was a reasonable portion of Cole’s estimate of $6,995 to level the whole foundation, as only the portion around the fireplace was a redhibitory defect. He dismisses Barnhill’s estimate of $188,000 to rebuild the house as totally out of proportion to its appraised value of $96,839.
A seller who knows that the thing he sells has a defect but omits to declare it, or a seller who declares that the thing has a quality that he knows |14it does not have, is liable to the buyer for, inter alia, the return of the purchase price, reasonable expenses, damages and reasonable attorney fees. La. C.C. art. 2545. Such a seller is called a “bad faith seller.” Id., Revision Comments (f), (g); Capitol City Leasing Corp. v. Hill, 404 So.2d 935 (La.1981). Whether a seller is in bad faith is a question of fact subject to manifest error review. Ollis v. Miller, supra, and citations therein. Likewise, the amount awarded for a reduction of purchase price is a question of fact for the trial court and will not be disturbed in the absence of manifest error or abuse of discretion. Mayfield v. Reed, 43,226 (La.App. 2 Cir. 4/30/08), 981 So.2d 235; Ollis v. Miller, supra.
As noted above, the record does not show that either the buy-sell agreement or any of the contract addenda specified any problems with, or necessary repairs to, the foundation under the fireplace. Bruce testified that in the nearly 20 years he lived in the house, he never noticed any problem with the fireplace. The HouseMasters inspection, conducted shortly before the sale, identified only sagging joists which would be repaired or replaced, but no defects in the foundation. Cameron admitted that he did not even notice any problem with the floor by the fireplace until he had been in the house about three months, notably after he removed some interior walls and tried to install new flooring. On this record, the district court was not plainly wrong to find that at the time of the sale, Bruce was unaware that the foundation under the fireplace was defective, and *596 hence he was not a bad faith seller. There is no error in the denial of attorney fees.
| ifiFinally, Bruce contests the judgment of $2,500 by showing, without elaboration, that his expert foundation repairman, Dean Cole, set the price of leveling this foundation at $6,995, and that his building inspector Jimmy Sitter compiled a punch list of repairs, and his expert contractor Darrell Barnhill prepared a detailed estimate to perform all these repairs for a total of $188,000. The district court found, however, that the only redhibitory defect was the lack of piers and beams under the fireplace. With this finding, the court was not plainly wrong to reject Sitter’s list, which included electrical, roofing, ventilation and myriad other repairs completely unrelated to the redhibitory defect.
The court admitted its difficulty isolating, from Cole’s comprehensive estimate, the cost of repairing the defective part of the foundation. Cole testified that leveling this entire foundation would cost $6,995, even though the normal cost for a pier- and-beam house was $2,500 to $4,000. The court’s award of $2,500, Cole’s lowest estimate and roughly 35% of his highest estimate, seems reasonable to repair a small portion of the foundation that needs only four piers and perhaps six beams. We find no abuse of the court’s great discretion. Ollis v. Miller, supra. This assignment of error lacks merit.

Conclusion

For the reasons expressed, the judgment is affirmed. All costs are to be paid by the plaintiff, James Leonard Cameron.
AFFIRMED.

. Bruce did not define "scabbing” but this court understands it to mean nailing or screwing a flat piece of wood to both sides of the joist to straighten and strengthen it.

. (1) "Manufacturer” means a person or entity who is in the business of manufacturing a product for placement into trade or commerce. "Manufacturing a product” means producing, making, fabricating, constructing, designing, remanufacturing, reconditioning or refurbishing a product. "Manufacturer” also means:
(a)A person or entity who labels a product as his own or who otherwise holds himself out to be the manufacturer of the product.
(b) A seller of a product who exercises control over or influences a characteristic of the design, construction or quality of the product that causes damage.
(c) A manufacturer of a product who incorporates into the product a component or part manufactured by another manufacturer.
(d) A seller of a product of an alien manufacturer if the seller is in the business of importing or distributing the product for re *595 sale and the seller is the alter ego of the alien manufacturer. * * *