756 So.2d 424 (1999)
Jeffery and Lydia McMORRIS
v.
MARCOTTE BUILDERS, L.L.C.
No. 98 CA 2302.
Court of Appeal of Louisiana, First Circuit.
December 28, 1999.
Rehearing Denied February 15, 2000.
Writ Denied April 20, 2000.
*426 Ernest M. Forbes, Denham Springs, for Plaintiffs/Appellees, Jeffrey & Lydia McMorris.
Rodney N. Erdey, Livingston, for Defendant/Appellant, Marcotte Builders, L.L.C.
Before: CARTER, C.J., LeBLANC, and PETTIGREW, JJ.
CARTER, C.J.
This is an appeal by a seller, Marcotte Builders, L.L.C., (Marcotte Builders) from a judgment ordering the recission of a sale of a residential lot containing a 33-foot drainage servitude and awarding $28,737.66 for return of the purchase price, interest, and attorney's fees. The appeal was answered by the buyers, Jeffrey and Lydia McMorris, seeking an award of general damages and additional attorney's fees.

FACTS
Summer Run Subdivision (Summer Run) is a single street cul de sac located in Denham Springs, Louisiana. The property that was subdivided into Summer Run was owned and developed by Marcotte Builders. Before the land was subdivided, Marcotte Builders obtained permission from Livingston Parish to fill in a creek that meandered through the property over several of the proposed lot sites. Marcotte Builders created a drainage ditch in a different location which affected fewer lots in the development. This drainage ditch was placed in a straight line between lots 6 and 7 on one side of the street and between lots 23 and 24 on the opposite side of the street.
As a result of creating the drainage ditch, Marcotte Builders granted Livingston Parish a drainage servitude of 50 feet on each side of the ditch in order to allow access to the ditch for maintenance purposes. Because of the existence of this servitude, the property owner could not place any structure within the area of the servitude to impede access to the ditch.
In the fall of 1996, Jeffery and Lydia McMorris began looking for a new home. The McMorrises also began meeting with a builder to discuss the type of home they wanted. By January 1997, they had finalized plans for the home they wanted to build. At the suggestion of their builder, the McMorrises looked at lots in the new development of Summer Run. Summer Run contained 30 lots, each with an average frontage of 80 feet.
According to Lydia McMorris, when they initially looked at the subdivision, they had a map reflecting the layouts and dimensions of each lot, which they had taken from a box in the front of the development. The map also indicated which lots had been sold and which lots were still available. As the McMorrises were considering lots in the subdivision to build their home, they noticed that Lot 24 appeared to be a larger lot and also had an attractive oak tree in the front. While observing the lot from the street, the McMorrises noted a drainage ditch running along the entire the left side of the lot, which they determined could be concealed with either a fence or shrubbery.
After viewing the lot, the McMorrises decided they wanted to build their house *427 on Lot 24. On March 2, 1997, Jeffery McMorris returned to Summer Run during an open house. Jeffrey McMorris and Joey Marcotte, a representative of the seller, walked from the open house to Lot 24; however, due to inclement weather, they did not walk on the lot or step off the actual footage. When they returned to the open house, Jeffery McMorris indicated he wanted to purchase Lot 24, and agreed on the purchase price of $19,500.00.
Dee Baurerle, the real estate agent, drew up a purchase agreement which was signed by McMorris and Marcotte. The dimensions of the lot set forth on the purchase agreement were "87 × 308 × 83 × 281." The McMorrises had previously consulted with their builder regarding whether their house could be placed on a lot with these dimensions and were assured by their builder the lot size would accommodate their plans.
After the purchase agreement was completed, Jeffery McMorris received a Property Disclosure Statement completed by the seller that informed them of certain information that the seller knew about the property. On this particular statement, the following question appeared, "Do you know of easements, servitudes, rights-of-way, or encroachments which would adversely affect this property?" Joey Marcotte, who completed the form, checked the box marked "No" as the answer to this question.
On May 8, 1997, the parties closed the sale on Lot 24. Included within the act of cash sale was the following language, "Said property is sold, conveyed and accepted subject to any and all valid restrictions, servitudes, mineral conveyances and/or reservations affecting same, if any." Jeffery and Lydia McMorris both testified that at no time prior to the closing or at the closing were they informed that a 33 foot drainage servitude existed on Lot 24, thereby making the usable portion of the lot smaller than the dimensions that were indicated in the purchase agreement. The McMorrises never saw the final plat of the subdivision that was recorded in November 1996. The final plat reflected all of the servitudes affecting the lots in the subdivision. The McMorrises never had any type of survey done because it was not required by the bank they used to obtain financing.
Approximately one to two weeks after the sale, Jeffery McMorris was at the lot with his builder, Ronnie Rushing, making preparations for the start of construction. While they were marking the four corners of the lot, Marcotte stopped at the lot. During the course of their short conversation, Joey Marcotte indicated there was a drainage servitude on the lot. Once Jeffery McMorris realized that the servitude made the usable portion of the lot smaller, he and the builder tried to reposition the house on the lot; however, the house, as designed, could not be repositioned to fit on the lot. The possibility of redesigning the house to fit on the lot was not an option for the McMorrises because they did not want to build a house that differed from the one in their original plans. The McMorrises both testified had they known of the existence of the drainage servitude, they would have never purchased Lot 24.
According to Marcotte, he felt the servitude did not adversely affect the lot because the lot could still be used for residential development. Marcotte testified he was never informed of the specific plans the McMorrises had for their home. When Marcotte showed Jeffrey McMorris the lot, he was aware of the servitude on the lot, but admitted he did not know exactly how wide it was.
After a trial on the merits, the trial court found the drainage servitude did adversely affect the lot because the usable portion of the lot was significantly less than the lot size reflected in the purchase agreement. Accordingly, the trial court found the McMorrises would not have purchased the lot has they been informed of the dimensions of the usable area of the lot prior to the sale. A motion for new trial *428 filed by Marcotte Builders was denied. Marcotte Builders appeals the judgment of the trial court assigning error with the finding that the lot contained a latent defect and with the finding of damages. The McMorrises answered the appeal and argue that the trial court failed to award any amount of general damages and additional attorney's fees for services rendered in connection with responding to the motion for new trial filed by Marcotte Builders.

DISCUSSION
Redhibition is the avoidance of a sale on account of some vice or defect in the thing sold, which renders it either absolutely useless, or its use so inconvenient and imperfect, that it must be supposed that the buyer would not have purchased it, had he known of the vice. LSA-C.C. art. 2520. A purchaser may seek to rescind the sale under the provisions of LSA-C.C. art. 2520.
Generally, the seller warrants the thing sold against hidden or non-apparent defects. LSA-C.C. arts. 2475 and 2521. Apparent defects are those defects that the buyer might have discovered by simple inspection, and that apparent defects are not among the number of redhibitory vices. LSA-C.C. art. 2521. Hidden or non-apparent defects are those which cannot be discovered by simple inspection. Landaiche v. Supreme Chevrolet, Inc., 602 So.2d 1127, 1131 (La.App. 1st Cir.1992). Simple inspection involves more than mere casual observation, it requires the buyer who observes defects to conduct further investigation as would be conducted by a reasonably prudent buyer acting under similar circumstances. Landaiche, 602 So.2d at 1131.
In order to determine whether a defect is apparent upon simple inspection, the courts have used a reasonableness standard, which is set forth in Pursell v. Kelly, 244 La. 323, 335-36, 152 So.2d 36, 41 (1963) as whether a reasonably prudent buyer acting under similar circumstances would have discovered the presence of a defect. Furthermore, a buyer is only under a duty to make an inspection that is reasonable in light of all the circumstances surrounding the sale. Whether an inspection is reasonable depends upon the facts of each case and includes such factors as the knowledge and expertise of the buyer, the opportunity for inspection, and the assurances made by the seller. Landaiche, 602 So.2d at 1131.
The redhibition action also lies if the thing sold is depicted as having some quality it does not possess. LSA-C.C. arts. 2520, 2529; Landaiche, 602 So.2d at 1131. A declaration that the thing sold has some quality which it is found not to have can also give rise to redhibition if this quality was the principle motive for making the purchase. LSA-C.C. art. 2529; Landaiche, 602 So.2d at 1131.
The existence of a redhibitory defect is a question of fact that cannot be disturbed unless the record as a whole establishes that the finding is manifestly erroneous or clearly wrong. Landaiche, 602 So.2d at 1131. Similarly, the determination of whether a defect is apparent by reasonable inspection is a factual determination that will not be disturbed by the appellate court unless manifestly erroneous. Landaiche, 602 So.2d at 1131.
In the instant case, the seller did not provide the McMorrises with any information revealing how the drainage servitude drastically reduced the usable portion of their lot. The marketing plat the McMorrises obtained prior to their purchase of Lot 24 indicated the dimensions of the lots, but did not reflect the effects of the 33 foot drainage servitude running along the northern boundary of the lot. The purchase agreement described the approximated measurements of the lot as "87 × 308 × 83 × 281." The Property Disclosure Statement completed by the seller indicated that there were no known servitudes adversely affecting the lot. However, after deducting the drainage servitude, *429 utility servitude and building restrictions, the usable portion of the lot was 83 × 214 × 50.68 × 186.24. The impact of the drainage servitude on the usable portion of Lot 24 is magnified by the fact that Lot 24 is slightly wedge shaped, with dimensions tapering toward the back of the lot. Because the lot narrows in the back, the usable portion is considerably diminished by the servitude. Thus, the lot would not accommodate the house the McMorrises wanted to build.[1]
The trial court further found the existence of the drainage servitude was a non-apparent defect. We agree. While the drainage ditch was clearly visible to anyone inspecting the property, the existence of the 33-foot servitude could only be discovered by an examination of the title or a survey. However, the McMorrises' bank did not require a survey, and their closing attorney never mentioned the existence of the drainage servitude. Accordingly, there was no assurance that the servitude would have been discovered without the seller revealing it to the buyers.
Joey Marcotte testified that he showed Jeffrey McMorris a copy of the official plat reflecting the drainage servitude prior to McMorrises' execution of the purchase agreement. However, Jeffrey McMorris testified he never saw the final plat prior at any time. It is clear that two permissible views of the evidence existed and that, in reaching his decision, the trial judge made reasonable evaluations of credibility and reasonable inferences of fact. Therefore, his choice between the conflicting views of the evidence cannot be clearly wrong. See Stobart v. State, Through Department of Transportation and Development, 617 So.2d 880, 882-83 (La.1993). Accordingly, we find no error in the trial court's finding that the lot contained a hidden defect and the McMorrises would not have purchased the lot had they know about the defect.
Marcotte Builders points out that the judgment of the trial court does not specifically order return of the lot; however, we recognize the McMorrises have stipulated that the lot will be returned. Marcotte Builders also complains that the trial court awarded various costs and interest, without any admissible evidence. We note that an exhibit identified as "P-10", which was an in globo offering of cancelled checks and statements to verify loan payments to the Bank of Commerce and Deposit Guaranty Bank was introduced into evidence without objection. The failure to object to the admission of such evidence precludes Marcotte Builders from raising this issue on appeal. LSA-C.E. art. 103; Bourg v. Bourg, 96-2422, p. 5 (La.App. 1st Cir.11/7/97), 701 So.2d 1378, 1381.
The McMorrises answered the appeal seeking an award of general damages and an increase in attorney's fees incurred when Marcotte Builders filed a motion for new trial. Nonpecuniary damages, such as those awarded for mental anguish and inconvenience, are not compensable in an action for redhibition unless the evidence and the nature of the contract indicate the purchase was prompted by a significant nonpecuniary purpose. Young v. Ford Motor Co., Inc., 595 So.2d 1123, 1133 (La. 1992).
The trial court did not award the McMorrises any general damages, and after our review of the record, we cannot say that was an error. The nature of the contract in this case does not indicate, nor do the facts and circumstances surrounding the purchase of the lot indicate, the lot was purchased for a significant nonpecuniary use. Accordingly, the denial of general damages was appropriate.
However, we note that trial court should have awarded attorney's fees for the additional costs of defending the motion for new trial filed by Marcotte Builders. *430 Therefore we hereby award an additional $500.00 in attorney's fees.

CONCLUSION
Based on the foregoing reasons, we affirm the judgment of the trial court and amend the judgment to award an additional $500.00 as attorney's fees. All costs of this appeal are assessed to defendant, Marcotte Builders, L.L.C.
AMENDED AND AFFIRMED AS AMENDED.
NOTES
[1] We find it is of no importance whether the seller knew of the specific house plans; the standard focuses on what the buyer would have done.