917 So.2d 713 (2005)
Larry Eldon DAGE, Jr. and Kathy Edwards Dage, Plaintiffs-Appellees
v.
John Ernest OBED, et al., Defendants-Appellants.
No. 40,414-CA.
Court of Appeal of Louisiana, Second Circuit.
December 14, 2005.
*714 Hallack Law Firm, by William H. Hallack, Jr., Dennis W. Hallack, Monroe, for Appellants.
H. Herbert Hobgood, Monroe, for Appellees.
Before BROWN, WILLIAMS, and PEATROSS, JJ.
BROWN, C.J.
Larry Eldon Dage, Jr. and his wife, Kathy Edward Dage, filed suit against John and Janiece Obed, Frank Ricks d/b/a All Phase Service Company, Inc., and American Exterminating Company on May 30, 2001. The Dages alleged that they purchased a commercial property located at 215 Trenton Street, West Monroe, Louisiana, for $147,500 from the Obeds on May 30, 2000. Plaintiffs sought a diminution in the purchase price of the building because of redhibitory defects. The suit against American Exterminating Company was dismissed before trial, and the suit against Frank Ricks and All Phase Service Company, Inc., was dismissed the morning of trial, leaving only the claim against the Obeds. The trial court rendered judgment ordering a $35,000 quanti minoris price reduction. Defendants have appealed.

Facts
In the months of April and May of 2000, plaintiffs considered purchasing the building at 215 Trenton Street owned by defendants and used as an antique mall. Plaintiffs' intent was to operate a beauty parlor in part of the building. They inspected the property three times. Plaintiffs noticed signs of an old leak in the rear men's bathroom, but were assured each time by John Obed that a new roof had been recently installed.
Plaintiffs reviewed a number of reports. Prince and Company issued an inspection report that stated that there were no signs of active leaks, there was water damage to ceiling tiles from previous leaks, and the roof had been replaced ten years earlier. Prince and Company were hired to make this inspection by the Kellys, a couple previously interested in buying the property. The Kellys did not purchase the property because Obed refused to make any repairs, wanting to sell the building "as is."
Obed's disclosure form stated that the building "has had a leak" and that the roof was one year old. Prior to purchase, plaintiffs hired Frank Ricks to inspect the building, which he did on May 5, 2000. Ricks' initial report indicated structural damage to the rafters under the flat roof area, and opined that some of the damage was severe. Ricks strongly recommended that a structural engineer make an inspection. *715 Ricks mentioned that John Obed had not allowed him on the roof. After plaintiffs called Obed and repeated what Ricks had said, Obed arranged for Ricks to inspect the roof. Ricks made a second inspection, and, in a supplemental report on May 21, 2000, observed that the roof was sound but that the sheeting wasn't installed properly so that water would run off at a slower rate than it would if the sheeting were correctly installed.
As noted above, Obed had used the building as an antique mall, wherein certain vendors would rent space to sell their wares. Larry Dage testified that Obed requested that the Dages not communicate with the vendors or employees at the site, as they might become nervous that the building was changing ownership. Prior to purchase, plaintiffs were never in the building during or soon after it rained. Cathy Dage testified that she looked at the building with her husband and that Obed told her that the building had a "perfectly good new roof." Although she saw stains, she did not observe wetness.
Obed's asking price for the building was $150,000. Plaintiffs countered with $140,000 and two conditions. The first was a non-compete agreement for antique stores, as Obed owned several other buildings in the area, and the second was a one-year warranty on the roof, which had been a condition of the previous buyers interested in purchasing the building. Eventually plaintiffs and defendants settled on a price of $147,500, including the non-compete clause but not the warranty on the roof. Plaintiffs testified that they felt comfortable dropping the one-year roof warranty after Obed explained to them that a new roof was warrantied for 30 to 50 years by the roof installers.
Plaintiffs hired Randy Stephenson to remodel in the rear of the building for the beauty salon in September and October of 2000. After tearing out the rear men's bathroom, the Dages and Stephenson discovered a fiberglass bathtub with a PVC drain pipe in the original ceiling above the bathroom.
Obed contends that plaintiffs' carpenter, Randy Stephenson, tore out a supporting wall resulting in the roof dropping four inches. Stephenson testified that the roof had leaked before he began remodeling the men's bathroom and that he did not remove any load bearing walls. Further, Stephenson testified that there are no load bearing walls to remove in the building, as the structure is covered by a truss roof which is carried by both walls on the exterior of the building. The walls in the rear men's bathroom did not go all the way to the roof, but only high enough to support the storage loft directly above. Stephenson commented that buildings like the one at issue are essentially only roofs with the parapet walls being of secondary value.
Plaintiffs testified that it only rained once during the summer of 2000 and that there may have been a small leak in the rear men's bathroom during that rain. It rained more in September and October 2000, when the Dages observed an increase in the leakage, as well as additional leakage along the right side of the building. The leaks worsened in December and in early January 2001, prompting plaintiffs to ask John Obed for the name of the company that had installed the roof.[1]
Charlie Hood was admitted as an expert witness in roofing. He first inspected the building in question at plaintiffs' request in early 2001 and at that time took many *716 photographs. Hood believed the material used to cover the roof to be "regular roll roofing," which is very cheap and generally lasts only two years before cracking and leaking. If the material were indeed "modified roll roofing," it would still crack soon after installation from bending to the wind, as "modified roll roofing" is supposed to be "laid flat and sealed." Here it was simply laid flat.
Hood tore out the layers of roll roofing above the rear men's bathroom and discovered rotten decking underneath, which he replaced with new wood. Additionally, Hood noted a serious problem with the roof in that the rain caught in a 3,000 square foot area would be forced through a drainage hole the size of a baseball. The drainage hole was reduced in size due to the roll roofing.
Hood also pointed out that one serious cause of leakage was due to a spot where two sheets, presumably roofing sheets, overlapped. Tar was used as a flashing for the overlap, and when the tar cracked, water poured into the building, rotting several of the joists. Tar is a poor material for flashing, and Hood opined that when tar is used for flashing, leakage is inevitable. This area is at the base of an unused water tower, which Hood stated should have been removed, as any projection on a roof is a potential source of leakage. Hood also discovered that the electrical pipes were coated with spray foam, which is bad protection, and Hood testified that he would have used a boot made up to go around the pipes and then filled with tar.
Charlie Hood noted the generally poor state of the roof, believing it to be amateur work. Hood also observed that there were numerous leaks, due to the use of tar, and opined that the longest the tar could hope to last would be two years, if applied properly. Hood stated that it would be difficult to just patch the roof up without removing most of it and starting over. Hood estimated the cost to replace the roof would be in the range of $35,000, assuming no other damage existed under the roof. Hood testified that he gives a 12-year warranty on material and a 2-year warranty on labor.
Evelyn Lolley testified that she began working for defendant as a cashier in October of 1998, two years before plaintiffs purchased the building. From the beginning Lolley knew of a leak at the bar, leaks in the electrical cabinet, coat closet, and the back window, as well as heavy leaks in the restroom area where they kept tubs to catch the water. She testified that she also used buckets to catch the water that were as tall as Lolley's waist, and she was five feet tall. The buckets and tubs had to be brought out whenever it rained, almost filling all the way and becoming far too heavy for her to lift. Lolley also noticed a PVC pipe in the men's bathroom when she cleaned at the end of the day. Lolley was told by Obed not to discuss anything with prospective buyers.
Evelyn Lolley testified that the roof leaks as much after plaintiffs purchased the building as it did before, but noted that because of a dry spell the leakage wasn't noticeable until September. According to Lolley, the remodeling in the rear of the building had no impact on the amount of leakage. Lolley stated that the Dages were surprised and angry when the roof leaked in their salon. On cross exam, Lolley testified that she did not recall a hail storm in 1998 or 1999 that, according to John Obed, damaged many roofs on Trenton Street.
John Obed testified that after the hail storm in 1998 or 1999, he hired Bob Chandler to repair the roof damage. Chandler employed both of defendants' sons and people from City of Faith, a halfway house, *717 to rebuild the roof. The job cost the $23,000 the Obeds received from the insurance company for a new roof and took two to three months to complete. There were leaks immediately, but either Chandler or one of defendant's sons tarred the spots, and the leakage stopped. Obed did not know if Chandler, an insurance adjuster, had any training or experience in roof repair or installation.
Obed testified that he told plaintiffs that he had put a 26-gauge metal roof on a year before, and that it should last from 30 to 40 years. Obed verified the sales agreement document, his signature on the document, and the passage, "sold as is for a total consideration."
Obed testified that he visited the building frequently after the sale, and that he and Chandler observed that the ceiling had dropped four inches, likely due to the remodeling work. Obed believed that the wall removed by Stephenson caused the leaks. The Dages and their carpenter deny the existence of any load bearing walls in the building, and they likewise dispute that the ceiling dropped any distance.
Ann McClendon worked as the broker for the sale of the building. McClendon testified that she explained to the plaintiffs what it means to buy a property "as is."
The trial court found that the building possessed a redhibitory defect that diminished the usefulness and/or the value of the building to such a degree that plaintiffs would have bought the building but for a lesser price. The court used Hood's estimate of $35,000 for repairs as the source for its damage award. The Obeds have timely appealed from the trial court's judgment, arguing that plaintiffs knew or should have known of, or should have further investigated the roof's defect.

Discussion
Louisiana Civil Code art. 2520 provides:
The seller warrants the buyer against redhibitory defects, or vices, in the thing sold.
A defect is redhibitory when it renders the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect. The existence of such a defect gives a buyer the right to obtain rescission of the sale.
A defect is redhibitory also when, without rendering the thing totally useless, it diminishes its usefulness or its value so that it must be presumed that a buyer would still have bought it but for a lesser price. The existence of such a defect limits the right of a buyer to a reduction of the price.
La. C.C. art. 2521 provides:
The seller owes no warranty for defects in the thing that were known to the buyer at the time of the sale, or for defects that should have been discovered by a reasonably prudent buyer of such things.
The court in McGough v. Oakwood Mobile Homes, Inc., 34,019 (La.App.2d Cir.11/1/00), 779 So.2d 793, 800, succinctly set forth the rules for reviewing factual findings of a trial court in the context of redhibition:
In general, a court of appeal may not set aside a trial court's find of fact in the absence of manifest error or unless it is clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). The existence of a redhibitory defect is a question of fact which cannot be disturbed unless the record establishes that the finding is manifestly erroneous. Ford Motor Credit v. Laing, 30,160 (La.App.2d Cir.1/21/98), 705 So.2d 1283;

*718 McMorris v. Marcotte Builders, L.L.C., 98-2302 (La.App. 1st Cir.12/28/99), 756 So.2d 424, writ denied, XXXX-XXXXX (La.4/20/00), 760 So.2d 1158. Similarly, the determination of whether a defect is apparent by reasonable inspection is a factual determination that will not be disturbed by appellate court unless manifestly erroneous. McMorris v. Marcotte Builders, L.L.C., supra.

"[T]he `as is' stipulation, especially in the sale of a used thing, means that the thing is not warranted to be in perfect condition and free of all defects which prior usage and age may cause." Bond v. Broadway, 607 So.2d 865, 867 (La.App. 2d Cir.1992). The trial court found that the roof was defective. With this ruling, we agree; however, the outcome of this case depends on the buyers' knowledge or what a prudent buyer should have discovered.
In Lemaire v. Breaux, 00-1826 (La.App. 5th Cir.04/11/01), 788 So.2d 498, 501-503, the court held that when a purchaser observes stained ceiling tiles and receives a strong recommendation for a roof inspection from her own real estate agent, but said purchaser ignored the strong recommendation for a roof inspection and proceeds with the purchase, a redhibitory claim based upon a leaking roof must fail. If the defect is apparent and could have been discovered by simple inspection, plaintiff has a duty to make a further investigation. A failure to do so waives the right to sue in quanti minoris. Pursell v. Kelly, 244 La. 323, 152 So.2d 36 (1963); and Caple v. Green, 545 So.2d 1222, (La.App. 2d Cir.1989)
As noted above, Frank Ricks performed the inspection of the building for plaintiffs before they purchased the building. Ricks did not go on the roof during the initial inspection. Ricks observed that the rafters on the underside of the roof were rotten, and that they needed to be repaired. Ricks prepared a report that "strongly recommended" plaintiffs hire a structural engineer to inspect the building and that the deteriorated wood be repaired.
Ricks testified that when Obed allowed him onto the roof, he did not actually walk over the roof, as Obed was afraid it would could cause leaks, but that he was allowed to view the roof from a small flat area. Ricks could tell that there had been serious leaking in the past due to fallen ceiling tiles, rusted ceiling tiles, rotten woodwork in the bathroom, and fallen stucco, all of which Ricks told to the plaintiffs.
Plaintiffs were advised to make sure that the roof was good. Thereafter, defendants dropped the price by $2,500, and plaintiffs dropped the one-year warranty for the roof. A reasonably prudent buyer would have been on notice that the roof was a problem and insured its soundness under the circumstances of this case. A reasonably prudent buyer would have asked for the warranty documents. The trial court based its opinion on the fact that the roof presented a redhibitory defect; however, such a defect was apparent by any reasonable inspection and in this case, made known to the buyer. The trial court's opinion was clearly in error and manifestly erroneous.

Conclusion
For the reasons set forth above, the judgment of the trial court is reversed and judgment ordered in favor of defendants, dismissing plaintiffs' action. Costs are assessed against plaintiffs.
REVERSED AND RENDERED.
NOTES
[1] According to plaintiffs, Obed first told them that the roofers were out of business. Later in the conversation, Obed admitted that he, his son, Bob Chandler, and a few other workers had installed the roof.