CARAWAY, J.
h The enclosed estate in this action was surrounded on three sides by a lake. The only access to a public road was across lands previously subdivided by defendants for lake front development. The roads laid out for the subdivision ended at a dead end at plaintiffs enclosed property, yet the roads were not dedicated public roads. Before the trial, the parties stipulated that plaintiffs tract was enclosed and that the existing roads provided plaintiff with the least injurious access through the subdivision to the nearest public road. Plaintiff was also allowed by consent judgment before trial to gravel the last portion of the road leading to his tract. The trial addressed the defendants’ reconventional claims for indemnification to the servient estate under Civil Code Article 689 and their claims for trespass for plaintiffs initial unauthorized use of the roads. The trial court judgment recognized the servitude in favor of plaintiffs property, awarded indemnification to defendants and addressed other matters regarding plaintiffs use of the roads in the subdivision. Both parties appeal the rulings. We affirm in part and reverse in part.

Facts

On May 20, 2005, Kenneth A. Greenway (“Greenway”) purchased about 7 acres of land on Grand Bayou Lake in Red River Parish for $50,000 cash. The peninsular-shaped tract was surrounded by the lake on three sides. On the west side of Green-way’s property was Grand Bayou Subdivision, originally platted in 1987. The west *298 erly property line of Greenway’s tract abutted Lot 10 of Grand Bayou Subdivision and Elm 1 ^Street, a 50 foot wide road, as shown on the subdivision plat. Elm Street is shown on the plat as extending along the water’s edge on the south side of the peninsula, ending as a dead end at Greenway’s property line. The recorded plat declared that “STREETS ARE NOT DEDICATED TO THE PUBLIC.” Notwithstanding, the recorded restrictive covenants for Grand Bayou Subdivision addressed the use of the roads, as follows:
The parties further declare that the roads shown on said plat are not dedicated to the public, however, the owners of any lots of the Grand Bayou Subdivision are granted a perpetual right of use for said roads.
Because of the creation of the public lake around his property and the nonpublic nature of Elm Street, Greenway’s land is an enclosed estate. Six weeks after purchasing his property, Greenway sued the Grand Bayou developers for a right of passage, alleging that his property was an enclosed estate pursuant to La. C.C. art. 689. Greenway’s petition alleged that Mary S. Wailes, Minnie Belle Gilcrease, Judy Marshall Dickson and James Troq-uille (hereinafter collectively “Wailes”[1]) owned the adjoining, subdivided land, including Elm and Oak Streets in the subdivision which provided access to the nearest public road.
On July 20, 2005, Wailes reconvened, and alleged ownership of 70 acres, subdivided into Grand Bayou Subdivision and Grand Bayou Subdivision Unit No. 2. Wailes further alleged that “they have sold a variety of the lots ... however the roads in Grand Bayou Subdivision are all | ^privately owned as more fully set forth in the public records of Red River Parish.”
At the eventual trial of this case, the parties’ stipulations included Greenway’s ownership of his property and Wailes’ ownership of the subdivision roads. The parties further stipulated that the location of the shortest and least injurious route to access the public road was along Elm and Oak Streets.
Greenway testified that he knew about the problem with access before he bought his parcel. Over the weekend immediately following the Friday when his deed was recorded, Greenway had 80 or 90 percent of his land cleared with a bulldozer. On cross-examination, he described his initial entry to the land through the subdivision as follows:
Q Mr. Greenway, tell me, before we had this limited agreement of access, what — tell me, explain to me what rights you had in this road? What rights you had to use it or rights you had in it?
A Before we had the July 22 agreement?
Q Yes, sir.
A I was — there were no — -there are not any no trespassing signs posted. They’re actively trying to sell lots. I would assume that I could ride through that neighborhood just like any other person.
Q But, before that you weren’t just riding through, you had brought a dozer out there and you were clearing land, correct?
A That is correct. And, when I was requested to stop we did so immediately.
*299 Thereafter, at a hearing on July 22, 2005, the parties jointly stipulated to an agreement permitting Greenway access to work on his property. The trial court signed a consent judgment on August 1, 2005, which gave | ¿Greenway a right of passage for unlimited general use via Oak Street, Elm Street and part of Maple Street. Also, Greenway was allowed to move heavy equipment to his property for certain limited time periods to burn brush and haul off ash using a licensed, bonded and insured contractor. Finally, the consent judgment authorized Greenway, at his option, the right to “deliver and spread gravel to that part of the roadway which currently has no gravel, being the part connecting his property to Elm Street, across the tract presently owned by Mr. Troquille.” The consent judgment reserved the remaining issues for trial.
Thereafter, Greenway hired a contractor to clear the lot and build a road. He spent $4,427 for 452 linear feet of gravel road, 352 feet of which was placed on the existing road (Elm Street) in Grand Bayou Subdivision. This portion of Elm Street apparently extended along the south side of Lots 8, 9 and 10, which formed the base of the peninsula of land before reaching Greenway’s property. Greenway testified about the difference in the condition of the road along Elm Street as it approached his property:
Q What part of the road, condition of the road, was different?
A Well, you can see from the photographs that it was — When the gravel stopped there by Ms. Gilcrease’s driveway it was nothing but a little dirt, pig trail if you will. After we got done, we put 139 tons of gravel on that road. We spent a little bit of money improving it and making it drivable. And we actually dressed up the road in front of Ms. Gil-crease’s house. And the road in the neighborhood is slightly better than it was when we left.
He further testified that the subdivision road was not of “uniform” width. In some places it was about 8 feet wide, and a little wider at the intersections. |sThe road Greenway constructed was “as wide as the road was there at Ms. Gilcrease’s house, and we followed the path of the previous dirt road.”
Mary S. Wailes testified as follows concerning Greenway’s gravel operations on the existing subdivision road:
Q ... As part of this limited access, tell me what your understanding was, about the portion of the road that Mr. Greenway was going to improve, that he was going to put gravel on. What was your understanding?
A That he was — We had a solid base on that road, that you could pass on. It was — -The subdivision is on a sand pile and sand washes. We had graded the roads as low as we could, planted the sides with grass, so that we could pass, and put the gravel on about fourteen — I believe it measures about sixteen feet across those roads, that we fixed. And Mr. Greenway volunteered to put gravel from Ms. Gil-crease’s house down to his lot. What we expected was that he was just going to put gravel, like we did on the front_ Instead of Mr. Greenway going directly to his property, he cut across which was the Troquille property, that now belongs to Mr. Grigs-by....
The testimony suggested that Grigsby was the successor in title to one of the three lots fronting Elm Street formerly owned by Troquille.
After the trial, the trial court ruled from the bench. The judgment, signed on Feb *300 ruary 10, 2006, dismissed Wailes’ trespass claim against Greenway, finding that Greenway’s use of -the subdivision roads before the initial consent judgment caused no damages to Wailes. Greenway was granted a predial servitude of passage for the benefit of his land, the dominant estate, through any roads existing in Grand Bayou Subdivision, the servient estate. Based upon the testimony of land appraisers concerning the value of the lake property, the trial court also ordered Greenway to pay to Wailes $15,885 in compensation for the servitude, plus judicial interest | fifrom July 20, 2005. In reference to that $15,385 compensation award, the judgment further provided as follows:
Pursuant to La. Civil Code art. 690, this judgment is applicable only if Greenway maintains, constructs or allows five (5) or less lots for individual home sites on the property referenced herein. Should Greenway construct or allow more than 5 lots for individual home sites on his property, Wailes shall be entitled to seek further compensation in accordance with applicable law.
Finally, Greenway was ordered to pay his proportionate share of annual maintenance in the same and similar manner as requested of other owners of lots in Grand Bayou Subdivision. Both parties appeal.

Discussion

I.
This enclosed estate dispute is somewhat unique because of two facts which were never in dispute. First, the location of the actual strip of land within the Wailes’ servient estate[2] over which the Greenway’s legal servitude of passage has now been designated (hereinafter the “Elm/Oak Corridor”) is admitted by the parties. A controversy over the location of the passage right, usually adjudicated by application of Civil Code Article 692,[3] is not present because the parties stipulated that the Elm/Oak Corridor is the “shortest route” to the public road and the route “least injurious” to the Wailes’ surrounding property.
17Second and most significant, it is undisputed that the Elm/Oak Corridor was already burdened by the real obligation of an existing right of passage/predial servitude in favor of the subdivision lot owners who, for the most part, are not parties to the suit.[4] This undisputed fact makes the Wailes’ ownership of the Elm/Oak Corridor tantamount to ownership of land subject to a public road, as indeed all lot *301 owners, their guests and members of the public at large seeking to contact lot owners are free to travel on the Elm/Oak Corridor virtually at will. Also, the existence of the rights of use of the other lot owners means that Greenway has stipulated that the court’s establishment of his legal servitude along the Elm/Oak Corridor will be a shared passage right.
Clearly, by virtue of the recorded covenants, the Wailes’ ownership of the Elm/ Oak Corridor was subject to the perpetual rights of passage in favor of the subdivision lots, which themselves would otherwise be enclosed estates in the absence of the existing rights of passage. Also, from that narrow corridor of land, Wailes could receive no civil fruits and rents for its surface use. Thus, in terms of our civilian concept of the bundle of property rights comprising the ownership of the Elm/Oak Corridor, Wailes’ | ^ownership is virtually a naked legal title[5] without the rights of usus and fructus. In this case, the Wailes claim that their naked legal title, which admittedly now owes an additional servitude of passage to accommodate Green-way’s enclosed estate, is subject to indemnification which the trial court awarded in the amount of $15,385.
Civil Code Article 689 defines the legal servitude for the right of passage to an enclosed estate. That article provides for a right of indemnification to owners of the servient estate as follows:
“He [the owner of the enclosed estate] is bound to indemnify his neighbor for the damage he may occasion.”
From this principle, the question presented is whether the trial court’s recognition and grant of the right of passage over the Elm/Oak Corridor in favor of Greenway has damaged the Wailes’ naked legal title to that tract? For the following.reasons, we find no damage.
Initially, as indicated above, all of the owners of real rights in the Elm/Oak Corridor were not made parties in this suit.[6] In contrast to the Wailes’ ownership of the naked legal title, the critical ownership that may be subject to some “damage” occasioned by Greenway’s use of the gravel | (¡subdivision streets is the right of use owned by the lot owners who also are entitled to a right of passage over the Elm/Oak Corridor.[7] However, as indicated by the analogous principle reflected in Civil Code Article 720, “[t]he owner of the servient estate may establish thereon addi *302 tional servitudes, provided they do not affect adversely the rights of the owner of the dominant estate.” In this case, the trial court’s judgment recognizing the legal servitude of passage in favor of Greenway established an additional burden upon the servient estate of Wailes. However, that burden does not appear to adversely affect the existing rights of use of the dominant estate owners of the subdivision lots. See, Collins v. Taylor, 518 So.2d 602 (La.App. 1st Cir.1987). Their use of the Elm/Oak Corridor is the same as the newly imposed use in favor of Greenway and can be exercised jointly without any conflict, like the use of a public road.
In recognition of the joint use of the subdivision roads, the trial court’s judgment attempted to regulate the future contingency of road maintenance between Greenway and these absent lot owners as set forth in the following provision:
Greenway shall pay his proportionate share of annual maintenance in the same and similar manner as requested of other owners of lots in the Grand Bayou Subdivision. Greenway’s proportional payment of maintenance is based on the number of lots and/or single family dwellings existing or being constructed on his tract of land and will be increased proportionately as additional single family dwellings and/or lots are added within the Greenway tract.
ImThis judgment, however, is flawed. First, it implies that Wailes, with their naked legal title to the Elm/Oak Corridor, may regulate the predial servitude rights of the lot owners and Greenway by imposition of an undefined annual maintenance charge. The subdivision covenants do not give Wailes such power as the owners of the servient estate.[8] To the contrary, the Civil Code articles governing the rights of owners of the dominant estate for a right of passage suggest that such maintenance expense will be borne by the subdivision lot owners and Greenway and is not an obligation owed to Wailes as owners of the servient estate. La. C.C. arts. 744, 691 and 651. Second, by implication the judgment attempts to regulate the maintenance expense of the joint use of the passageway for parties who are not litigants. This is not only procedurally improper, but unnecessary. By analogy to Civil Code Article 806[9] governing the rights of co-owners, the maintenance expense of the joint use by the owners of the conventional right of passage, the lot owners, and the owner of the legal right of passage, Greenway, should be shared. Otherwise, by tacit dedication to the governing political subdivision (La. R.S. 48:491) or other agreement with the political subdivision, the streets within the subdivision may, through a political process, become public with maintenance by the political subdivision, as in the case of most streets in populated subdivisions.
In Second, because of the nature of the legal servitude which has now been recognized, the Wailes’ naked legal title to the Elm/Oak Corridor has not been damaged, nor has their property been taken from them, like an expropriation. Civil Code Article 659 defines a legal servitude *303 such as the right of passage owed to an enclosed estate as a limitation on ownership established by law. La. C.C. art. 659. The limitation on ownership is for the “common utility” of adjacent properties which has been a policy of this state regarding ownership of immovables since statehood. Civil Code of 1808, Art. 12; see Art. 664, La. C.C. Comp. Ed. in 16 LSA-C.C., p. 406 (1972). Likewise, Article 689’s legal servitude for the protection of the enclosed estate has been a limitation on ownership of immovables since our earliest civil code. Civil Code of 1808, Art. 46; see Art. 699, La. C.C. Comp. Ed. in 16 LSA-C.C., p. 429 (1972). Thus, the title to Wailes’ property has been burdened with this limitation since its severance from the sovereign, and the newly materialized need for the servitude by the neighboring estate does not create the equivalent of a “taking.” Smith v. Chandler, 251 So.2d 417 (La.App. 1st Cir.1971). Article 689 speaks of damage. It does not discuss compensation based upon the appraised value as though the servient estate used for the roadway has been expropriated.[10]
We find that the trial court’s focus on the appraised values of these lake front properties and the enhancement of the value of the Greenway L ¿tract attempted to provide Wailes a measure of compensation analogous to expropriation, which is not the test of Article 689. Instead, Article 689 only allows that the property “may” receive “damage” requiring indemnification by the owner of the dominant estate. As indicated above, Greenway’s newly recognized use of the Elm/Oak Corridor is not any more burdensome on the Wailes’ ownership of the tract. They were not free in their ownership of the streets to do anything else with the use of the property other than to allow transportation through the subdivision. Greenway’s additional transportation right therefore results in no damage to the ownership of the naked legal title to the streets.[11]
Accordingly, we conclude that the recognition of the right of passage for Green-way’s enclosed estate did not cause damages to the Wailes’ property, which was already subject to conventional and perpetual rights of passage in favor of the lot owners of the subdivision. The trial court’s award of $15,385 is reversed and the quoted provisions of the judgment attempting to address the maintenance expenses for the Elm/Oak Corridor and the future use of Greenway’s property are likewise reversed.
II.
Wailes’ answer to the appeal asserts that the trial court erred in failing to find a trespass because of Greenway’s initial entry through the 1 ^subdivision onto his property before the consent judgment *304 and because of his work in graveling the roads after the consent judgment.
The evidence reveals that Greenway entered his property after his purchase of the land and immediately began clearing work. There is no evidence that the roads in the subdivision were posted prohibiting the public from using the roads. The contractor who conducted the clearing work for Greenway lived in the subdivision and moved his heavy equipment across the subdivision streets which was his presumed right as an owner in the subdivision. The trial court’s ruling emphasized that the general public would expect to have the use of these subdivision roads. The trial court also found that Greenway’s initial use and his use thereafter had not caused damage to Wailes.
Wailes’ technical urging of a trespass was appropriately rejected by the trial court. The active, unfettered use of the roads by the public was the relevant fact entitled to greater weight than Wailes’ complicated ownership, and even if an intentional tort of trespass occurred, there was no showing of damages.
Finally, the Wailes claim that they will be forced to repair certain damages caused by the manner in which Greenway constructed the last portion of Elm Street near his property. That road grading work was performed pursuant to the initial consent judgment and was never raised as a specific topic in Wailes’ reconventional pleadings. The claim, as indicated above, would involve the real rights of the other lot owners in the subdivision who own the rights of passage to the roads. The Wailes, in their | ucapacity as the owners of the naked legal title to Elm Street, are not responsible for road grading or the appropriate width of the gravel on Elm Street. To the extent that Greenway’s work in any manner affected the property of the adjacent lot owners, those owners may independently assert their claims.

Conclusion

The trial court’s judgment recognizing Greenway’s right of passage and rejecting Wailes’ claims for trespass and related damages is affirmed. The portions of the judgment awarding indemnification to Wailes and addressing annual maintenance expenses and Greenway’s future use of his property are reversed. Costs of appeal are assessed to appellees.
AFFIRMED IN PART, REVERSED IN PART.

. Ultimately, the parties stipulated that MSW Properties, Inc., Judy Dickson and James Troquille owned the roads, and the record indicates that Mary S. Wailes is an owner of MSW Properties, Inc. It is this group that owns the subdivision streets which will be referred to as Wailes.

. The Elm Street and Oak Street corridor does not actually run through the defendants' surrounding lands along its entire course to a public road. This is because the record indicates that it runs through parts of the subdivision where the lot owners on either side of the street are not members of the Wailes group.

. La. C.C. art. 692 provides: "The owner of the enclosed estate may not demand the right of passage anywhere he chooses. The passage generally shall be taken along the shortest route from the enclosed estate to the public road at the location least injurious to the intervening lands.”

. In the filing of the plats for the subdivision by the original owner(s), it was indicated that no statutory dedication of the streets was made pursuant to La. R.S. 33:5051. However, the covenants for the subdivision designated rights of passage over the streets to all future lot owners, with no gated access restriction into the subdivision placed upon the lot owners or parties interacting with the lot owners. The covenant for the specified use of the roads pursuant to the subdivision plan, if not actually creating true predial servitudes by itself, would fall under our law governing building restrictions. La. C.C. art. 775. The rights created by such covenant are incorporeal immovables and real rights likened to predial servitudes and regulated by application of the rules governing predial servitudes. La. C.C. art. 777.

.The term "naked legal title" is of course not a reference to "naked ownership” as discussed in the Civil Code articles on usufruct. La. C.C. art. 535, et seq. The term will be used herein as it is sometimes figuratively employed in the jurisprudence to indicate property ownership subject to such a significant servitude so as to leave the owner of the servient estate with very little enjoyment and economic value from the property. See De-Sambourg v. Board of Commissioners for Grand Prairie Levee District, 621 So.2d 602, 610 (La.1993), where the supreme court referred to the ownership of batture property as “naked legal title ... subject to the servitude, without right of usus and fructus." In Police Jury of Parish of St. James v. Borne, 198 La. 959, 5 So.2d 301 (1941), the court observed that the "naked title" of a tract subject to a servitude for a road "would be of little value” to the owners thereof.

. The appellate court may notice on its own the nonjoinder of indispensable parties and apply the peremptory exception. La. C.C.P. art. 927. However, from our analysis, the absence of the other lot owners from this litigation does not as a practical matter impede their ability to protect their interests. La. C.C.P. art. 641.

. Professor Yiannopoulos notes in his treatise that the indemnification owed under Article 689 "... may also be due to a person having a predial servitude or other real right on the servient estate.” A.N. Yiannopoulos, 4 Louisiana Civil Law Treatise Predial Servitudes § 98, at 288, Note 2 (3d ed.2004).

. The individual members of the Wailes group and/or the group as a whole apparently own certain lots in the subdivision which may allow them to seek reimbursement for maintenance expense as co-owners of the servitude of use for the streets, as discussed infra.

. Article 806 provides, in pertinent part: "A co-owner who on account of the thing held in indivisión has incurred necessary expenses, expenses for ordinary maintenance and repairs, or necessary management expenses paid to a third person, is entitled to reimbursement from the other co-owners in proportion to their shares.”

. The possibility for joint use of a right of passage by the owners of the dominant and servient estates in this legal servitude setting is a practical reality recognized by the jurisprudence and supported by the "least injurious” principle of Civil Code Article 692. See Cazes v. Robertson, 421 So.2d 423 (La.App. 1st Cir.1982). Thus, in a situation involving the construction of a new roadway by the owner of the enclosed estate, the servient estate may in fact receive economic benefit (in contrast to "damage”) by the use of the roadway by consent of the owner of the enclosed estate, if not by operation of law.

. In reaching this conclusion, the case of Hutchison v. Jackson, 399 So.2d 1238 (La. App. 3d Cir. 1981), relied upon by Wailes, is easily distinguished. The property for which compensation for damages was awarded in that case was not previously subjected to an existing road servitude in favor of the public or other adjacent lot owners, so that the party awarded compensation for damages owned full ownership of the tract and not, as in the present case, naked legal title.