MOORE, J.
 

 | ¶Dean and Ashley Elston and D.A. Ri-chlen Corporation, owners of enclosed estates in Bossier Parish, appeal a judgment which granted only in part their request to enforce a conventional servitude, rejected their claim for a wider legal servitude, and ordered the Elstons, Richlen and Mike Montgomery, the owner of the servient estate, to pay 1/3 each the cost of repairing the existing servitude. For the reasons expressed, we amend the judgment to set the cost of repair at the amount proved at trial, $29,700, with legal interest from date of judicial demand, but in all other respects we affirm.
 

 Factual Background
 

 The enclosed land, sometimes called “the Webb property,” consists of 346 acres in the horseshoe formed by Bodcau and Red Chute Bayous in southern Bossier Parish.
 
 [1]
 
 Jo Nell Montgomery and her son, Mike, owned some 53 acres at the base of the horseshoe. A public road, Sligo Road, runs basically north-south along the base of the horseshoe. A smaller road, Old Sligo Road, turns east off Sligo Road and runs along Bodcau Bayou, providing access into the enclosed land, but the Bossier Parish Police Jury formally abandoned Old Sligo Road in 1976. Since then, the blacktop Old Sligo Road has been the only way the Montgom-erys and the Webbs could get to their property.
 

 Mrs. Montgomery built a house close to Old Sligo Road in the early 1970s and for many years the Webbs used the enclosed land as a pecan orchard, cattle pasture and hayfield. The Webbs’ tenants and employees 12drove right past Mrs. Montgomery’s house and all concerned seemed to be in a peaceful coexistence.
 

 In March 1998, the Elstons bought from Mrs. Webb a 20-acre parcel just to the east of the Montgomerys, intending to build their home there. According to testimony, the bank would not give the El-stons a building loan unless they obtained a servitude of passage, guaranteeing their right to use Old Sligo Road. There was
 
 *827
 
 much testimony about the discussions between the new neighbors,
 
 [2]
 
 but they executed a servitude of passage on March 26, 1998 (hereinafter, “the 1998 agreement”). The provisions critical to this case were as follows:
 

 • The Montgomerys granted “a perpetual servitude of passage over their respective property for the use and benefit” of the Elstons, described as a “30 foot road servitude.”
 

 • The Montgomerys “shall at no time obstruct the servitude of passage in any manner so as to interfere with the use thereof by the Grantees or their successors and/or assigns except as to the gates herewith agreed to.”
 

 • Both sides acknowledged “that several gates presently exist on the old abandoned Sligo Road and agree that said gates will not be removed from their present location, but at no time shall Grantor prevent Grantee from entering said gates.”
 

 • Both sides “shall at all times maintain the said right of way in good order and condition and shall contribute equally to the cost of such maintenance.”
 

 The Elstons built their house and began raising a family; they also ran a landscape business and photography studio from their home. Mike Montgomery, a Bossier Parish firefighter who runs a lawn service from his home, got married and built a house behind his mother’s, further back off [s01d Sligo Road. He started a family, and parents and children got along splendidly with their neighbors the Elstons, even going on vacations together. The Montgom-erys did not seem to mind the landscaping trucks rolling down Old Sligo Road, and the Elstons did not seem to mind the post- and-boom gate across Old Sligo Road at the juncture with Sligo Road; this stayed open most of the time. As for the servitude, testimony showed that Jo Nell Montgomery usually mowed the unpaved portion of the 30-foot strip, and Dean Elston usually patched routine potholes with a few bags of Quikrete™.
 

 In 2002, Mrs. Webb sold the rest of her land inside the horseshoe, over 300 acres, to Richlen, a family corporation owned by Dean’s mother, Lennis Elston. Lennis El-ston testified that Richlen owns over 6,000 acres in the area, and her intent in buying the Webb property was to build an upscale subdivision, similar to (but nicer than) the nearby Olde Oaks and Old River Place developments. She did not, however, submit her plan for this to the Metropolitan Planning Commission, admitting major obstacles existed in that part of the tract was designated as a flood zone, the economy was in a downturn, and (critically) there was no public access to the tract. Richlen was not a party to the 1998 agreement.
 

 The parties’ amiable relationship suddenly unraveled in mid-2007 when land-men swarmed the area seeking leases in the Haynesville Shale. The Elstons, controlling 346 acres, promptly signed with an agent for Petrohawk; the Montgomerys did not, and were horrified at the prospect of heavy oilfield traffic rumbling right past their homes. Ashley Elston, |4Pean’s wife, went to the Montgomerys’ house to straighten things out, but apparently this visit only stoked the tensions. On August 21, 2007, the Montgomerys’ attorney sent the Elstons a certified letter demanding $3,800 as half the cost of mowing and string-trimming the servitude over the pri- or nine years, and $14,650 as half the cost to repave the road. Shortly after this, Mike Montgomery installed a funnel-shaped fence with an automatic 16-foot gate in place of the old manual post-and-
 
 *828
 
 boom. The new gate was supposed to open by remote (which the Montgomerys had) or by keypad (the entry code was given to the Elstons and their employees).
 

 The Elstons felt the narrow, automatic gate had been installed purely in retaliation for the mineral lease and to obstruct large oilfield vehicles from entering. The Montgomerys admitted the gate was plagued with mechanical problems and often did not open, inconveniencing the El-stons and their employees. However, they felt it was essential for security, as they had heard of vandalism in the nearby subdivisions. At trial, they reluctantly conceded that if an 18-wheeler (en route to be loaded with pecans, for instance) had to stop at the gate, it would project into Sligo Road, creating a hazard. Around the same time as they installed the automatic gate, Mike Montgomery also laid some unusually tall speed bumps on Old Sligo Road, and his mother placed large cinder blocks on the side of the servitude to prevent vehicles from riding around the speed bumps.
 

 Relations between the parties sharply deteriorated. One illustrative incident would be August 24, 2007, when Mike Montgomery phoned the Elstons around midnight, ostensibly asking for help to move his brokenjdown6 Ford truck off Old Sligo Road; after all, he wanted to keep the servitude open for them. When the Elstons refused, Mike allegedly stormed up to their front porch and banged on the door, and got into a shouting match with them. The next day, Dean Elston obtained an order of protection from the district court, prohibiting Mike from harassing or talking to any of the Elston family or going within 100 yards of their house.
 

 Procedural History and Subsequent Facts
 

 On October 19, 2007, the Elstons filed this suit to maintain and enforce the 1998 agreement. The Montgomerys reconvened, claiming $3,800 for mowing and $14,650 to repave the road. In December 2007, the parties entered a consent order whereby the Montgomerys agreed to keep the gate open at all times and to build no additional fencing; each party agreed not to communicate with the other; and the Montgomerys agreed not to repave the road until the litigation was completed.
 

 According to the Montgomerys, after this time the blacktop surface of Old Sligo Road got much, much worse. Notably, Petrohawk has never performed any exploration on the Webb property, but Mike Montgomery leased part of his land for a cell phone tower and another part as an on-location set for the movie “The Pardon.” In 2008, the Montgomerys granted Petrohawk a 40-foot easement across their property, and Mike bought out his mother, making him the sole owner of the servient estate.
 

 In February 2008, Richlen intervened, adopting all the Elstons’ claims and further demanding a 60-foot legal servitude along Old Sligo Road to accommodate a new subdivision, plus removal of the automatic | (¡gate and existing fence.
 

 The pattern of distrust and harassment continued although the parties made several efforts to settle the case, including an interim order in April 2009 whereby Mike Montgomery reconfigured the fence and gate to make it less restrictive, and the Elstons paid him $2,500 and were allowed to patch some of the worst potholes. However, the gate continued to malfunction, in several incidents poignantly described by Ashley Elston at trial.
 

 The matter proceeded to trial over three days in November 2009 and March 2010. The parties testified as outlined above. In addition, Mike Montgomery testified that
 
 *829
 
 he had just installed a “panel gate” with a 16-foot automatic gate and 10-foot manual gate, for a total width of 26'10". He said this was set back farther from Sligo Road so, if necessary, an 18-wheeler could wait at the gate and not jut into the highway. He also said the automatic portion was a top-of-the-line Door King 6300 electric gate that could be programmed to open and close at certain times and should be very reliable.
 

 The Elstons testified that all the friction and conflict had finally been too much for them; they built a new house just off Hwy. 1 in Shreveport and planned to move out of their Bossier home just days after the trial ended. The Elstons also called Forrest Raburn, a civil engineer and land surveyor, who unveiled their proposed Pecan Plantation Subdivision, consisting of 28 lots ranging from 5 to 12 acres each. Despite the problems with flood zoning, lack of access and the economy, he felt that the “highest and best use” of the Webb property was as a luxury subdivision. Finally, the Elstons 17called James A. Young, a real estate appraiser, who felt there was a “lot of demand” for the kind of subdivision the Elstons were proposing.
 

 The Montgomerys called an expert appraiser, Mark Montgomery, who felt that because of the issues cited and dismissed by Raburn, the Webb property was best suited for agricultural purposes, its current use. They also called Christopher Fink, a paving contractor, who testified that there was no sense in simply repairing Old Sligo Road; it needed a complete overlay, which he estimated would cost $29,700.
 

 Action of the District Court
 

 The district court issued written reasons for judgment, finding that the inconvenience created by the servient estate must be measured by a standard of reasonableness. Citing the prevalence of “gated communities” in the area and
 
 Watts v. Baldwin,
 
 95-0260 (La.App. 1 Cir. 10/6/95), 662 So.2d 519, it found that a gate was not an unreasonable hindrance if it was open during daylight hours and, at night, users of the dominant estate could open it without leaving their vehicles. Next, the court strictly applied the 30-foot width stated in the 1998 agreement, and noted that as to Richlen (which was not a party to the agreement) developing its sizable tract made economic sense. The court found, however, that Richlen has no absolute right to commercially subdivide its property, and thus the 60-foot servitude was not required. The court awarded Richlen a 30-foot servitude identical to the Elstons’. The court also ordered the Montgomerys to remove the speed bumps, and found that the Elstons’ earlier payment of $2,500 adequately compensated the Montgomerys for mowing the servitude. Finally, the court |8found the road was no longer in good order and condition, and accepted Fink’s estimate of $29,700 to repave it. Even though the 1998 agreement called for the Montgomerys and Elstons to share this cost equally, the court found that because Richlen had demanded and received a right of passage, it should bear an equal share; the court ordered the Montgomerys, the Elstons and Richlen to pay $9,900 each.
 

 After some discussions regarding phraseology, the Montgomerys submitted a final judgment that the district court signed on August 3, 2010, recognizing the 1998 agreement, granting Richlen a coextensive legal right of passage, and incorporating the other provisions of the written reasons. 11VII ordered the Elstons and Richlen to pay $9,900 each, “plus interest at the legal rate from the date due under this judgment, until paid.” Finally, ¶ IX stated that if the Elstons and Richlen failed to pay “within the delay for taking
 
 *830
 
 suspensive appeal of this judgment, which is the due date,” then they must pay “one-third of the actual cost of repaving the road, even if the actual cost of repaving the road exceeds $29,700, plus interest[.]”
 

 The Elstons and Richlen have appealed suspensively, raising five assignments of error.
 

 Discussion: Allowance of the Gate
 

 By their first assignment of error, the appellants urge the district court erred in allowing a gate at the head of Old Sligo Road to restrict and interfere with their access to their property. They show that the 1998 agreement prohibits the Mont-gomerys from obstructing the passage “in any manner so as to interfere with the use thereof’ except for “the gates therewith agreed to” and “several gates [that] presently exist[.]” They cite Mike Montgomery’s testimony that at the time there were two horse gates along the bayou side of the servitude and one at the entrance to the Elstons’ property, and Dean Elston’s testimony that they never discussed adding a gate across Old Sligo Road. They concede that Mike Montgomery’s wife and mother said the gate had always been there, but argue that old photos (Exhibit P-51, images 35 and 36) show only a cattle guard, no gate. They argue that under La. C.C. art. 748, the owner of the servient estate “may do nothing tending to diminish or make more inconvenient the use of the servitude,” and this gate is a pure impediment, as was the cable bander ordered removed in
 
 Stuckey v. Collins,
 
 464 So.2d 346 (La.App. 2 Cir.1985). They conclude the court was plainly wrong to find that the 1998 agreement did not prohibit the Montgomerys from constructing a security gate.
 

 The Montgomerys respond that the district court’s factual findings are subject to manifest error review, and that on disputed evidence, the court was not plainly wrong to find the parties discussed and agreed to this gate before they signed the servitude agreement. Further, the 1998 agreement expressly permits gates on the servitude, thus taking the case out of the purview of legal servitudes, La. C.C. art. 697 and
 
 Stuckey v. Collins, supra.
 
 They submit that the judgment more than adequately accommodates people needing access to the Webb property.
 

 Interpretation of a contract is the determination of the common intent of the parties. La. C.C. art. 2045. When the words of a contract are clear 11fland explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties’ intent. La. C.C. art. 2046. When a contract can be construed from the four corners of the instrument without looking to extrinsic evidence, the question of contractual interpretation is answered as a matter of law.
 
 Prejean v. Guillory,
 
 2010-0740 (La.7/2/10), 38 So.3d 274. However, a provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective. La. C.C. art. 2049. Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole. La. C.C. art. 2050.
 

 A contract is considered ambiguous on the issue of intent when either it lacks a provision on that issue, the terms of the contract are susceptible to more than one interpretation, there is uncertainty or ambiguity as to its provisions, or the intent of the parties cannot be ascertained from the language employed.
 
 Campbell v. Melton,
 
 2001-2578 (La.5/14/02), 817 So.2d 69;
 
 Miller v. Miller,
 
 44,163 (La.App. 2 Cir. 1/14/09), 1 So.3d 815. Factual findings pertinent to the interpretation of a contract will not be disturbed absent manifest error.
 
 Campbell v. Melton, supra; New
 
 
 *831
 

 man Mar chive Partnership v. City of Shreveport,
 
 40,512 (La.App. 2 Cir. 2/24/06, 923 So.2d 852),
 
 writ denied,
 
 2006-1040 (La.6/23/06), 930 So.2d 983. Under the manifest error standard, the appellate court may not reverse reasonable factual findings even if convinced that had it been sitting as a trier of fact, it would have weighed the evidence differently.
 
 Rando v. Anco Insulations Inc.,
 
 2008-1163 (La.5/22/09), 16 So.3d 1065;
 
 Meneweather v. Shelter Ins.
 

 Co.,
 
 43,109 (La.App. 2 Cir. 3/19/08), 978 So.2d 1243.
 

 The 1998 agreement provided that the Montgomerys “shall at no time obstruct the servitude of passage in any manner so as to interfere with the use thereof * * * except as to the gates herewith agreed to.” However, it did not describe the “gates herewith agreed to” and thus referred to a particular simply not stated in the agreement. The precise location of these gates cannot be ascertained from the language used. In such a situation, the court is permitted to consider extrinsic evidence, the testimony of the parties.
 
 Campbell v. Melton, supra; Miller v. Miller, supra.
 
 The testimony on this issue was highly conflicting, as might be expected of neighbors whose former friendship has ruptured and degenerated into rank animosity. We simply cannot say the district court was plainly wrong or abused its discretion in finding that the parties discussed and “herewith agreed to” a security gate at the head of Old Sligo Road.
 

 Another provision recognized that “several gates presently exist on the old abandoned * * * Sligo Road” and prohibited the Elstons from removing them. Read together and in a manner that gives meaning to the agreement as a whole, these passages fully support the district court’s finding that the parties contemplated the existence of gates as long as they did not unreasonably interfere with the use of the servitude. A gate which is open during daylight hours and may be opened by users of the dominant estate without leaving their vehicles during nighttime hours does not appear to impose an unreasonable burden on the use of the servitude. Moreover, in light of the conflicting testimony, the district court did not abuse its | ^discretion in finding that a security gate was a reasonable response to the Mont-gomerys’ security concerns.
 

 This assignment of error lacks merit.
 

 Expansion of Existing Servitude
 

 By their second assignment of error, the appellants urge the district court committed legal error in “permanently condemning” their property to its historical agricultural use by refusing to expand the servitude of passage to accommodate future subdivision development, and in prohibiting the construction of any road other than the current one. They concede that La. C.C. arts. 690 and 705 refer only to “the kind of traffic that is reasonably necessary” and the “reasonable use of the dominant estate,” but argue that the concept of necessity has been interpreted to permit the owner of the dominant estate to “obtain full utility of his land,”
 
 Rockholt v. Keaty,
 
 256 La. 629, 237 So.2d 663 (1970), and “in the manner which he may deem most profitable,”
 
 Littlejohn v. Cox,
 
 15 La. Ann. 67 (1860). Further, even though the servitude is fixed by contract, it may be relocated to reflect different property uses,
 
 Mitcham v. Birdsong,
 
 573 So.2d 1294 (La. App. 2 Cir.1991), or even expanded, if so doing does not aggravate the condition of the servient estate, A.N. Yiannopoulos, 4 La. Civ. L. Treatise,
 
 Predial Servitudes,
 
 §§ 155, 156 (3 ed.2004). They submit that their proposal of a viable subdivision project was proof of the highest and best use of the land, as in
 
 Greenway v. Wailes,
 
 41,412 (La.App. 2 Cir. 8/1/06), 936 So.2d 296, and warranted the award of a 60-foot
 
 *832
 
 servitude. Finally, they contend that even if only a 30-foot servitude was warranted, the court abused its | ^discretion in confining the road to only 12 to 16 feet wide.
 

 The Montgomerys respond that “highest and best use,” the standard of compensation in expropriation cases,
 
 [3]
 
 has never been the standard for fixing the width of a servitude of passage. They contend that Richlen’s legal right of passage under La. C.C. art. 690 is only for the “kind of traffic that is reasonably necessary” for the use of the dominant estate. They also argue that under recent jurisprudence, the scope of the servitude “is determined by the actual needs of the enclosed estate.”
 
 Davis v. Culpepper,
 
 34,736 (La.App. 2 Cir. 7/11/01), 794 So.2d 68; A.N. Yiannopoulos,
 
 op. cit.,
 
 § 93. They submit that Richlen’s proposed subdivision was purely speculative, being no more than a surveyor’s concept which had never even been submitted to the Metropolitan Planning Commission and failed to account for the fact that much of the tract is designated as a flood zone. Finally, they urge that the court did not abuse its discretion in finding that 12- to 16-foot paved surface of Old Sligo Road has been adequate for the needs of the Webb property since the police jury abandoned it in 1976, and continues to serve the dominant estate’s necessity.
 

 The legal right of passage for the benefit of an enclosed estate “shall be suitable for the kind of traffic that is reasonably necessary for the use of that estate.” La. C.C. art. 690. The scope of the right of way granted over neighboring lands is determined by the actual needs of the enclosed estate.
 
 Davis v. Culpepper, supra; May v. Miller,
 
 2006^418 (La.App. 3 Cir. 10/11/06), 941 So.2d 661,
 
 writ denied,
 
 2007-2009 (La.3/9/07), 949 So.2d 443. The right of passage is predicated on necessity; whether a passage is necessary or not is determined according to objective criteria rather than the wishes of the owner of the enclosed estate. A.N. Yianno-poulos,
 
 op. cit.,
 
 § 93, fn. 13. The trial court’s findings as to necessity under Art. 690 are subject to manifest error review.
 
 May v. Miller, supra.
 

 The district court may have been slightly overbroad in its statement that Louisiana law permits
 
 no
 
 right of passage for future development. In both
 
 Rockholt
 
 and
 
 Littlejohn, supra,
 
 the Louisiana Supreme Court intimated that the dominant estate may fully utilize its land to greatest profit, although these statements were plainly dicta.
 
 [4]
 
 In
 
 Greenway v. Wailes, supra,
 
 this court affirmed a legal right of passage that was conditioned on the development of five home sites on the dominant estate.
 

 In the court’s factual findings, however, we perceive no manifest error. Notably, the plaintiff in
 
 Greenway
 
 had cleared the greater part of the enclosed estate and hauled in a large amount of gravel; his plans were actual, not merely speculative. By contrast, Richlen showed only survey- or’s sketches, no formal plan submitted to the MPC, and could not explain how the subdivision would be approved with so much of it in a flood zone. The record also shows that in the nearby Olde Oaks and Old River Place subdivisions, sales of lots
 
 *833
 
 have slowed, suggesting no necessity for yet another upscale development. Also, because Old Sligo Road nearly 11sstraddles Bodcau Bayou, the additional 30 feet requested by Richlen would virtually have to be sliced from the south side of the road, coming even closer to the Montgomerys’ homes. On close consideration, we find no manifest error in the district court’s implicit conclusion that Richlen failed to prove necessity for a 60-foot servitude.
 

 We also find no manifest error in the court’s conclusion that the existing road, the 12- to 16-foot paved surface of the abandoned Old Sligo Road, is sufficient for the needs of the dominant estate. It has obviously served the owners of the enclosed property, with occasional patching and repairs, until Richlen floated the idea of a new subdivision. The court also noted that granting Richlen a 60-foot legal servitude, while limiting the Elstons to a 30-foot conventional servitude, would only cause confusion. On this record, we perceive no abuse of discretion.
 

 This assignment of error lacks merit.
 

 Necessity of Repaving
 

 By their third assignment of error, the appellants urge the district court erred in finding that Old Sligo Road needs to be repaved. They argue that the road surface is no worse than it was in 1998, when the Elstons signed the 1998 agreement, and that only Mike Montgomery felt it needed to be paved. They also show that the Montgomerys’ own expert, Chris Fink, agreed on cross-examination that it would be better to postpone repaving until all drilling activity concluded.
 

 The Montgomerys respond that the 1998 agreement requires them and the Elstons to “maintain the said right of way in good order and condition” |1fiand “contribute equally to the cost of such maintenance.” They submit the court was not plainly wrong to find the road no longer in “good order and condition.”
 

 As elsewhere, the record contains a divergence of testimony. Mike Montgomery testified on cross-examination that the road was “past repair”; his mother, who recalled an earlier time when it was just a gravel road, testified the pavement was now in bad condition; his wife, Sunni, said the potholes were “not that bad.” The Montgomerys’ expert, Chris Fink, testified that the road was past the point of mere patching and repair, but agreed that repaving could be deferred until after drilling operations were concluded. Lennis Elston, Dean’s mother and owner of Ri-chlen, admitted the road had “deteriorated significantly,” but felt that patching the potholes would be sufficient; Dean himself felt the road was no worse than it had been in 1998, except for potholes which could be easily patched. The photos in evidence show a blacktop road with many smooth stretches but long strips broken off along the edges and various deep potholes. Although the evidence is close, we cannot say the district court was unreasonable in finding that the road is no longer in good order and condition.
 
 Rando v. Anco Insulations Inc., supra.
 

 This assignment lacks merit.
 

 Indemnifícation by Richlen
 

 By their fifth assignment of error, the appellants urge the district court erred in apportioning the cost of maintaining the servitude 1/3 each to the Montgomerys, the Elstons and Richlen. They contend that no party Informally demanded from Richlen payment of these costs; no citation or service was ever made on Richlen; no proof was offered that Richlen ever damaged the servitude; and La. C.C. arts. 690, 691 and 744 do not permit the owner of the servient estate to dictate how the owner of the dominant estate must maintain the servitude.
 

 
 *834
 
 Richlen filed a petition of intervention alleging that it was the owner of an enclosed estate (having acquired it from Mrs. Webb by cash sale deed in 2002 and credit sale deed in 2007) and demanding a “perpetual legal servitude of passage.” La. C.C. art. 689 provides:
 

 The owner of an estate that has no access to a public road may claim a right of passage over neighboring property to the nearest public road. He is bound to indemnify his neighbor for the damage he may occasion.
 

 Any plaintiff demanding a legal right of passage under this article must allege that he is willing to pay compensation for the damages occasioned by the servitude.
 
 Morgan v. Culpepper,
 
 824 So.2d 598 (La.App. 2 Cir.1975),
 
 writs denied,
 
 326 So.2d 377, 378 (1976). By filing its intervention, Richlen effectively alleged its willingness to indemnify the Montgom-erys for the damages resulting from its use of the servitude. There was no need for the Montgomerys to demand payment of indemnification that was already admitted. In addition, Richlen has been using the road since 2002, only four years after the Elstons obtained the servitude, and owns over 15 times as much enclosed property as the Elstons. Naturally, the record does not ascribe any particular potholes or edge ruts to any particular party. Under the circumstances, the district court did not abuse its discretion in allocating a proportionate share of 1/3 of the cost to each party |1swho has used, and will use, the servitude.
 

 This assignment lacks merit.
 

 Form of Judgment
 

 By their fourth assignment of error, the appellants urge the final judgment infringed on their right to appeal and improperly cast them in judgment for an indeterminate amount. First, they argue that a judgment must be certain and not based on any contingency.
 
 Clark v. Diamond B. Const.,
 
 2000-2146 (La.App. 1 Cir. 12/28/01), 803 So.2d 1113. If the amount remains to be determined by a future contingency, “it is no proper judgment.”
 
 Russo v. Fidelity & Dep. Co.,
 
 129 La. 554, 56 So. 506 (1911). They contend that the provision ordering them to pay “actual repaving costs” is contingent on their failure to pay the estimate of $29,700 and hence improper. Next, they show that the judgment ordered them to pay “within the delay for taking suspensive appeal of this judgment, which is the due date[.]” They argue that this defeats the whole purpose of a suspensive appeal, which is to defer the effects of a judgment that could be possibly overturned until the appellate court upholds the ruling. La. C.C.P. art. 2123;
 
 American Branch Bldg. Corp. v. Bozeman,
 
 543 So.2d 1114 (La.App. 1 Cir.),
 
 writ denied,
 
 548 So.2d 1231 (1989).
 

 The Montgomerys respond that because the district court ultimately granted a sus-pensive appeal, this argument is moot. They also contend that because the 1998 agreement obligated every user to contribute to the cost of maintenance, the court did not abuse its discretion in ordering the appellants to pay them share of Mr. Fink’s estimate within a stated time, or else pay | istheir share of the actual cost.
 

 A final judgment must be precise, definite and certain.
 
 Barnes v. Riverwood Apartments Partnership,
 
 42,912 (La.App. 2 Cir. 2/6/08), 975 So.2d 720, and citations therein. Over a century ago, the Louisiana Supreme Court stated:
 

 [I]f a judgment purports to be final and is given upon a money demand, the amount of the recovery must be stated in it with certainty and precision. If the amount remains to be determined by a future contingency, or ascertained by references, or diminished by the allow-
 
 *835
 
 anee of an unliquidated credit, or is otherwise indefinite and uncertain, it is no proper judgment.
 

 Fontelieu v. Fontelieu,
 
 116 La. 866, 881, 41 So. 120,125 (1906);
 
 Succession of Jenkins,
 
 41,202 (La.App. 2 Cir. 7/26/06), 936 So.2d 268.
 

 We find that ¶ IX of the judgment, ordering the appellants to pay an unspecified “actual cost of repaving,” is imprecise, indefinite and uncertain. The only evidence of cost was Mr. Fink’s testimony, which set it at $29,700. The district court was within its discretion to accept this estimate, but not to award an alternative, unstated amount. We will amend the judgment by deleting this provision.
 

 When the object of the performance is a sum of money, damages for delay in performance are measured by interest on that sum from the time it is due, at the rate agreed by the parties or, in the absence of agreement, at the rate of legal interest. La. C.C. art. 2000;
 
 Hollenshead v. Gemini Explorations Inc.,
 
 45,389 (La.App. 2 Cir. 7/21/10), 44 So.3d 809,
 
 writ denied,
 
 2010-2046 (La.11/12/10), 49 So.3d 892. Rather than a punitive, uncertain amount, legal interest from date of judicial demand is the proper | gpremedy for delay. We therefore amend ¶ VII to assess legal interest from the date of judicial demand, which is November 27, 2007, for the Elstons, and February 1, 2008, for Richlen.
 

 This assignment of error has merit.
 

 Conclusion
 

 For the reasons expressed, we amend the judgment to state, in ¶ VII, that the Elstons and D.A. Richlen are each to pay $9,900, plus legal interest from date of judicial demand until paid, with date of judicial demand to be November 27, 2007, for the Elstons and February 1, 2008, for Richlen. We also amend the judgment to delete, in its entirety, ¶ IX, as an abuse of the court’s discretion and redundant in light of the amendment to HVIL In all other respects, however, the judgment is affirmed.
 

 Appellate costs are to be paid one-half by the Montgomerys and one-half by the appellants.
 

 AMENDED AND AFFIRMED.
 

 [1]
 

 . The Elstons acquired the property from their cousin, Charlotte Webb, whose family had owned it for many generations.
 

 [2]
 

 . At the time, Mike Montgomery was living in a trailer behind his mother’s house.
 

 [3]
 

 . See La. R.S. 19:9 (measure of compensation for expropriated property); R.S. 48:453 (measure of compensation for property expropriated by DOTD); R.S. 9:3183 (basis for determining value of expropriated property);
 
 Exxon Pipeline Co. v. Hill,
 
 2000-2535 (La.5/15/01), 788 So.2d 1154.
 

 [4]
 

 . In
 
 Rockholt,
 
 the court found that the plaintiff's tract was not truly "enclosed” in the sense required by La. C.C. art. 699, and hence not entitled to a right of passage. In
 
 Little-john,
 
 the plaintiff was not seeking to enlarge an existing servitude, but to recognize for the first time the legal right of passage.